**J. John MARSHALL, Plaintiff,**

**v.**

**MILES LABORATORIES, INC., Frank J. Geks, Walter E. Goldstein, and Richard B. Kocher, Defendants.**

**No. S 84–676.**

United States District Court,
N.D. Indiana,
South Bend Division.

Nov. 7, 1986.

Peter Kneski, Miami, Fla., for plaintiff.

Carl L. Taylor, Chicago, Ill., Brian S. Schuster, Victor Arko, Elkhart, Ind., Betty S. Womack, Washington, D.C., for defendants.

ALLEN SHARP, Chief Judge.

## MEMORANDUM AND ORDER

### I.

This case is before the court on the defendants' Motion for Summary Judgment, filed on November 27, 1985, pursuant to Rule 56 of the Federal Rules of Civil Procedure. The plaintiff filed a response on March 24, 1986, and the defendants filed a reply on April 21, 1986. In addition, the plaintiff, on May 20, 1986, filed a Motion for Partial Summary Judgment; the defendants filed their opposition on May 29, 1986. The court heard oral argument on May 30, 1986, and granted the plaintiff until July 6, 1986, to supplement the record regarding the motions for summary judgment. In addition the defendants were given until August 1, 1986, to respond. Due in part to the withdrawal of plaintiff's counsel and the appearance of a new counsel the plaintiff received an extension of time until August 11, 1986, to supplement the record. All parties have supplemented the record and the matters are ripe.

### A.

The material facts pertinent to the resolution of the federal issues are recited below. An association between the plaintiff and one of the defendants, Miles Laboratories, Inc. (Miles), began in February, 1976. On February 13, 1976, the plaintiff signed a letter dated February 12, 1986. That letter was the first consulting agreement;[1] which was renewed in 1977, 1978 and 1979. On June 23, 1980, the plaintiff became Director of Enzyme Research and Development at Miles. The job description, prepared by Miles, for that position states in pertinent part:

> To direct, plan, implement and supervise a balanced program of short, intermediate and long range research projects in protein chemistry, carbohydrates and enzymes that will assure the technological future of the IPG and the Corporation ... To translate ideas and concepts into products, prototypes and working models ... Develop, summarize and report information about advances in technologies of interest to IPG and maintain an awareness of the latest scientific advances in his specialty.

The plaintiff included the job description as an exhibit to his sworn affidavit. Further, the plaintiff testified during his deposition that the job description "in terms of the principal job function—'responsibility' is a better word—yes it was reasonable."

During the plaintiff's term of employment he became familiar with procedures Miles required employees to follow to obtain patents on inventions and obtain approval to publish articles or abstracts related to work done within the scope of employment. On March 26, 1982, the plaintiff, utilizing those procedures, sought ap-

---

1. The first consulting agreement includes the following language:

    All discoveries or inventions, whether patentable or not, resulting from your work under this agreement shall be the property of Miles without additional compensation ...

proval to publish an abstract and article. The text of the request is as follows:

Request is hereby made for approval to submit for publication the attached abstract entitled "The Potential of Immobilized Biocatalysts for the Production of Industrial Chemicals" by G.B. Borglum and J.J. Marshall. The paper will be presented in a symposium, of which I am co-chairman, at the 184th ACS National Meeting, Kansas City, September 1982. The full text in the form of a paper to be published in a book, *Immobilized Biocatalysts,* by J.J. Marshall and R.A. Messing will be submitted for approval at a later date, but certainly before presentation.

In paragraph 41 of the second amended complaint the plaintiff alleges:

Defendant Miles, in reliance upon such agreement, fraudulently acquired or claims to have acquired Plaintiff's rights in the copyright of an article to which Plaintiff contributed, which article was written not as a requirement of his employment with Miles, but rather at his own expense and on his own time. Miles has wrongfully misrepresented that such copyright belongs to Miles and that the article was written for the Defendant.

The plaintiff testified that that allegation refers to the article entitled "The Potential of Immobilized Biocatalysts for Production of Industrial Chemicals." That article was published as: G.B. Borglum and J.J. Marshall, *The Potential of Immobilized Biocatalysts for Production of Industrial Chemicals,* 9 Applied Biochemistry and Biotechnology 117 (1984). Both the abstract, submitted to Miles on March 26, 1982, and the published article associate the authors and the research with "Biotechnology Research, Miles Laboratories." The abstract and article discuss the "... translation from conception to practice of processes based on immobilized biocatalyst technology ..." Dr. Borglum, a Miles scientist, did the research which preceded the abstract and article at Miles. The plaintiff while he was a Miles employee met with Dr. Borglum, in plaintiff's office at Miles,

to discuss the abstract and presentation. In addition, Dr. Borglum and the plaintiff attended at Miles' expense, the conference where Dr. Borglum presented the paper.

On June 1, 1983, the plaintiff resigned from his position at Miles. Subsequently, the article was published, and the Humana Press, Inc., after attempting to contact the plaintiff, contacted Dr. Borglum regarding the acquisition of the copyright rights to the article. Dr. Borglum consulted the legal staff at Miles and it was determined that the article was a "work made for hire." Miles believed that the copyright rights were owned by them. Subsequently, Miles transferred the copyright rights to the Humana Press, Inc.

With the exception of the work completed with Dr. Borglum in the plaintiff's office at Miles, the plaintiff's contributions to the article are alleged to have been completed at places other than his office, laboratory, or the library at Miles.

Miles decided, in the Spring of 1983, that the employer-employee relationship with the plaintiff was not working out. In addition, Miles was concerned that the plaintiff's involvement in certain outside ventures, including one called "Starch Blockers" which was embroiled in controversy with the FDA, was having a negative impact on Miles' reputation. During several news reports about the starch blockers controversy the reports indicated that the plaintiff was a scientist employed by Miles. Consequently, Dr. Goldstein, met with the plaintiff and requested his resignation. Apparently at that meeting, it was suggested that if the plaintiff did not resign he would be terminated. The plaintiff did not immediately consent to voluntary resignation. Miles asked the plaintiff to submit a proposed list of terms under which he would resign. Subsequently, the plaintiff did submit a list of proposed terms which were incorporated in a consulting agreement which the plaintiff signed. The "Consultant Agreement" contained eighteen (18) numbered paragraphs. Those paragraphs contained substantially all of the terms that the plaintiff had proposed. Miles pre-

pared the document entitled "Consultant Agreement." The plaintiff and Dr. Goldstein met and reviewed the document on May 18, 1983. When the parties met, on May 31, 1983, to sign the consulting agreement the plaintiff requested that certain modifications be made to the document which was to be signed by the parties. Those modifications were made and initiated by the plaintiff and by Dr. Walter. E. Goldstein, Vice-President Research and Development, Biotechnology Group, at Miles. The modifications made involved the effective date of the agreement, the effective date of the plaintiff's resignation, an extension of Health and Life Insurance Benefits, and the reduction from $10,102 to $7,576 of an amount owed by the plaintiff to Miles "in connection with equipment purchased by the Company and located at the University of Notre Dame." After those modifications were made and initialed, by both parties, the plaintiff signed the agreement.

The Consultant Agreement was to continue for ten (10) months, which was a compromise between a request for twelve (12) months and an offer of six (6) months. In addition, the agreement included a clause, in paragraph three (3), which gave the plaintiff the right to "terminate this consultantship at any time by giving the Company a thirty (30) day written notice of termination ..." Further, the agreement prohibited the plaintiff from consulting for "any firm producing products or product lines directly competitive to the products and product lines of the Company," but the same paragraph provided a method whereby Miles, in its sole discretion, could "grant reasonable exceptions to [that] prohibition." The plaintiff admits that he never attempted to terminate the consulting agreement and never requested an exception to that prohibition.

### B.

To prevail, the party seeking summary judgment has the burden of establishing the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett,* — U.S. —, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986);

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Backes v. Valspar Corp.,* 783 F.2d 77 (7th Cir.1986). A material question of fact is a question which will be outcome-determinative of an issue in that case. *Anderson v. Liberty Lobby, Inc.,* — U.S. —, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Big O Tire Dealers, Inc. v. Big O Warehouse,* 741 F.2d 160 (7th Cir.1984); *Egger v. Phillips,* 710 F.2d 292 (7th Cir.1983) (en banc), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). Any reasonable inference to be drawn from the facts presented must be viewed in a light most favorable to the non-moving party. *Korf v. Ball State University,* 726 F.2d 1222 (7th Cir.1984). However, "if the evidence [in favor of the non-moving party] is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* — U.S. —, 106 S.Ct. at 2511 (citations omitted). The Supreme Court of the United States recently held that:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.

*Celotex,* — U.S. at —, 106 S.Ct. at 2552; *accord, Anderson, supra.*

### C.

In the third claim of Count IV of the plaintiff's Second Amended Complaint, the plaintiff alleges that Miles "fraudulently acquired" the copyright to a scholarly article which he wrote with Dr. G.B. Borglum, a scientist employed by Miles. The article at issue is entitled "The Potential of Immobilized Biocatalysts for Production of Industrial Chemicals" and was published in volume nine (9) of Applied Biochemistry and Biotechnology. Miles claims that that work was a "work made for hire" and the copyright is owned by Miles. However, the plaintiff alleges that he did not make his contributions to the article while he was working at his office at Miles.

Under the Copyright Act of 1976, an employer is considered the author of any "work made for hire."

> In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all the rights comprised in the copyright.

Copyright Act of 1976, 17 U.S.C. § 201(a) (1982). Further, a "work made for hire" is

> a work prepared by an employee within the scope of his or her employment;

17 U.S.C. § 101. There is a rebuttable presumption that the copyright of a work prepared within the scope of the employer-employee relationship is owned by the employer. *May v. Morganelli-Heumann & Assoc.*, 618 F.2d 1363, 1369 (9th Cir.1980), *citing, Yardley v. Houghton Mifflin Co.*, 108 F.2d 28 (2d Cir.1939), *cert. denied*, 309 U.S. 686, 60 S.Ct. 891, 84 L.Ed. 1029 (1940); *accord*, 1 M. Nimmer, *Nimmer on Copyright* § 5.03[b][1]. The parties did not expressly agree in writing that Miles would not own the copyright rights to work done within the scope of employment. However, the question is, was the plaintiff an employee and was the work created, within the scope of employment.

It is not disputed that the plaintiff was an employee at all times relevant to the preparation of the article at issue. Further, it is undisputed that the article was prepared from research done at Miles by Miles' scientists. The sole question which remains is whether the plaintiff's contributions were prepared within the scope of his employment. Miles alleges that the article was prepared within the scope of the plaintiff's employment. To support their allegation Miles refers to: the employment agreement; that the research which provided the basis of the article was done at

Miles by a Miles' scientist'; that the plaintiff and Dr. Borglum met in the plaintiff's office at Miles to discuss the preparation of the article; that Dr. Borglum, who did the research which provided the basis of the article is a co-author of the article; that the plaintiff submitted the abstract for approval and intended to submit the completed paper for approval; and that the plaintiff was reimbursed for any expenses he incurred related to the presentation of the article at the symposium. The plaintiff counters by stating that his contributions to the article were not prepared while he was at his office at Miles, that Miles never specifically instructed him to write this article, and that he was never given additional consideration for the article.

■ Neither case law nor the legislative history suggests that a person can avoid the "work made for hire" doctrine merely by preparing the work during non-working hours or in a facility not controlled by the employer. The mere fact that preparations were done outside an employee's office or normal working hours does not remove such preparations from the scope of employment. *Cf., Q–Co Industries, Inc. v. Hoffman*, 625 F.Supp. 608, 619 (S.D.N.Y. 1985).

■ To determine the scope of employment the court may look at the employment contract[2] and job description. Although the employment contract could easily resolve this issue the court does not rely on it because the plaintiff alleges the contract was signed under duress. The plaintiff testified at his deposition that the job description approved by Dr. Ingle reasonably described his responsibilities. That job description included as one of eight "Principal Activities/Objectives" the responsibility that the plaintiff "develop, summarize and report information about advances in technologies of interest to IPG

---

2. The employment contract includes the following language::

All discoveries or inventions, whether patentable or not, conceived jointly or solely by the EMPLOYEE during the period of employment shall become the property of the COMPANY

without additional compensation or consideration.

The plaintiff alleges that this contract was signed under duress. Therefore, the employment contract does not form any basis for the decision of the court.

..." It is not disputed that the article was of interest to Miles. Further, it is not disputed that the article presented information about advances in technology. Therefore, not merely contributions to but the creation of the entire article were clearly within the scope of the plaintiff's employment. The Seventh Circuit Court of Appeals recently adopted the Second Circuit Court of Appeals' analysis of the "work made for hire" doctrine in *Aldon Accessories v. Spiegel,* 738 F.2d 548 (2d Cir.1984), *cert. denied,* 469 U.S. 982, 105 S.Ct. 387 (1984). *Evans Newton, Inc. v. Chicago Systems Software,* 793 F.2d 889, 894 (7th Cir.1986). In the *Aldon* case the court held that the critical question was whether the employer caused the work to be made and exercised the right to direct and supervise the creation. *Aldon,* 738 F.2d at 551–552; *see also, Murray v. Gelderman,* 566 F.2d 1307 (5th Cir.1978); *Scherr v. Universal Match Corp.,* 417 F.2d 497, 500 (2d Cir. 1969). In this case, the job description clearly indicates that at Miles insistence the plaintiff initiated research and reported information about advances in technologies in various areas, and one of those research areas was immobilizing biocatalysts for the production of industrial chemicals. The plaintiff was paid by Miles "to direct, plan, implement and supervise ... research projects, ... and working models so as to assure an adequate scientific support to new products", and to "develop, summarize and report information about advances in technologies ..." The article in question specifically addresses "[t]he successful translation from conception to practice of processes based on immobilized technology ..." and was created from laboratory work done at Miles by Miles' scientists. Further, Dr. Borglum and the plaintiff discussed the article in the plaintiff's office at Miles.

### D.

■ It would be the plaintiff's burden at trial to overcome the presumption in favor of the employer. *May,* 618 F.2d at 1369. The undisputed facts of this case when viewed in a light most favorable to the plaintiff demonstrates that the employer-employee relationship between Miles and the plaintiff was the direct cause of the preparation of the article entitled *The Potential of Immobilized Biocatalysts for Production of Industrial Chemicals.*

A second factor in determining whether a work was made for hire is whether the employer had a right to control or supervise the creation. *See, Evans Newton,* 793 F.2d at 894; *accord, Aldon,* 738 F.2d at 551–552; *Scherr,* 417 F.2d at 500. In this case, Miles had "a policy which required each employee to submit a proposed manuscript or speech for review prior to giving a presentation or publishing a paper based on work conducted at Miles." (Affidavit of Walter Goldstein, paragraph 4). The plaintiff does not dispute that such a policy existed. Nor does the plaintiff dispute that, in an interoffice communication, he sought approval to present an abstract of the article and that the "full text" of the article would be "submitted for approval at a later date." Those undisputed facts demonstrate that Miles had and did exercise the right to control and supervise the preparation of a work based on research done at Miles, to be published. Therefore, the defendants are entitled to summary judgment on claim three of Count IV.

### E.

■ The next claims which will be addressed are found in Count X of the plaintiff's Second Amended Complaint. That count alleges that the "Consultant Agreement" was a restraint on trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (1982). Arguably, there are two claims contained in Count X. The first alleges a conspiracy to violate Section 1 of the Sherman Act. That claim alleges that Miles, Bayer (Miles parent corporation) and Dr. Goldstein conspired to force the plaintiff not to commercialize his independent inventions and to abandon lucrative business contracts. The Supreme Court of the United States in *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731 (1984), held that "there can be little doubt that the operations of a corporate

enterprise organized into division must be judged as the conduct of a single actor." *Copperweld,* 467 U.S. 752, 104 S.Ct. at 2742. Furthermore, "[t]he officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." *Id.,* 104 S.Ct. at 2741. In a footnote the Court added that "[n]othing in the language of the Sherman Act is inconsistent with the view that corporations cannot conspire with their own officers." *Id.,* at 2741 fn. 15; *cf,. Brunswick Corp. v. Riegel Textile Corp.,* 752 F.2d 261, 264 (7th Cir.1984) (a conspiracy between a corporation and its employees is not actionable under antitrust law); *accord, University Life Ins. Co. of America v. Unimare, Ltd.,* 699 F.2d 846, 852 (7th Cir.1983). The "persons" alleged to have conspired in this claim are the parent corporation, a subsidiary and an officer of the subsidiary; accepting the plaintiff's allegations as true, solely for the sake of the pending motion, the alleged conspiracy does not violate the antitrust laws.

### F.

The second claim in Count X alleges that the "Consultant Agreement" which contained a restrictive covenant was an illegal restraint on trade. Not all restraints on trade violate the Sherman Act only those restraints which are unreasonable. *Northern Pacific Railroad Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *accord, Cooperweld,* 467 U.S. at 767, 104 S.Ct. at 2740. An analysis of the reasonableness of a restrictive covenant utilizes state law. *See, South Bend Consumers Club v. United Consumers Club,* 572 F.Supp. 209 (N.D.Ind.1983), appeal dismissed 742 F.2d 392 (7th Cir.1984) (dismissal based on lack of jurisdiction of the interlocutory appeal); *cf. Mantek Div. of NCH Corp. v. Share Corp.,* 780 F.2d 702, 706–711 (7th Cir.1986). Further, under paragraph 16 of "Consultant Agreement" it states that the contract is governed by Indiana law. "Under Indiana Law '[t]he ultimate determination of

whether a covenant is reasonable is a question of law for the courts ...'" *Prudential Ins. Co. of America v. Diemer,* 637 F.Supp. 313, 315 (N.D.Ind.1986) (appeal filed); (citations omitted); *see also, South Bend Consumers Club v. United Consumers Club,* 572 F.Supp. 209 (N.D.Ind.1983). In Indiana, there is a three prong test for determining the reasonableness of a restrictive covenant. *South Bend Consumers Club,* 572 F.Supp. at 213, *citing, Donahue v. Permacel Tape Corp.,* 234 Ind. 398, 407–409, 127 N.E.2d 235, 239 (1955). "A covenant will be deemed reasonable only where: (1) the restraint is reasonably necessary to protect the employer; (2) it is not unreasonably restrictive of the employee; and (3) it is not against public policy." *Id.* In addition, restrictive covenants ancillary to an employment contract are more strictly scrutinized. *Id.*

The plaintiff was employed by Miles on a consulting basis following his resignation. Miles has an interest in insuring that during the duration of the consulting agreement, for which the plaintiff was paid $41,210, that the plaintiff did not work for a competitor of Miles. The covenant was necessary to protect Miles' interest.

Under the terms of the "consultant Agreement", which had a period of duration of ten (10) months, the plaintiff had the right to terminate the agreement "at any time by giving a thirty (30) day written notice ..." In addition, Miles had the sole discretion to grant reasonable exceptions to the restrictive covenant. The plaintiff never availed himself of either of those provisions. The undisputed facts demonstrate that this restrictive covenant did not unreasonably restrain trade. Furthermore, there is no evidence that a restrictive covenant such as the one included in the "Consultant Agreement" violates the public policy of Indiana.

Although Section 1 of the Sherman Act prohibits "[e]very contract ... in restraint of trade ..." it "does not in fact ban every contract in restraint of trade because 'read literally, § 1 would outlaw the entire body

of private contract law.' " *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 265 (7th Cir.1981), *quoting, National Society of Professional Engineers v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). Furthermore, the plaintiff bears the burden of proving the element that this restrictive covenant unreasonably restrained trade. *Id.* After an exhaustive analysis of the undisputed facts and after construing any inferences in a light most favorable to the plaintiff it is clear that the restrictive covenant was reasonable and does not violate Section 1 of the Sherman Act. Therefore, Miles should be granted summary judgment on Count X.

There is not independent federal jurisdiction in any of the remaining claims and this case is not before the court based on diversity. Therefore, the court declines to decide the pendent state issues. *See, United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *accord, Shlay v. Montgomery,* 802 F.2d 918 (7th Cir.1986).

Accordingly, and for all the above reasons, it is the ORDER of the court that the defendants' Motion for Summary Judgment, as it applies to claim 3 of Count IV of the plaintiff's Second Amended Complaint and Count X, be, and is hereby, GRANTED. It is FURTHER ORDERED that the plaintiff's Motion for Partial Summary Judgment be, and is hereby, DENIED. It is FURTHER ORDERED that the plaintiff's remaining claims be, and are hereby, DISMISSED WITHOUT PREJUDICE. Costs assessed against plaintiff. SO ORDERED.