**Gene ROUSE and Doyle Wilson, Plaintiffs/Counterclaim Defendants,**

**v.**

**WALTER & ASSOCIATES, L.L.C., and Marvin J. Walter, Defendants/Counterclaimants/ Third–Party Plaintiffs,**

**v.**

**Viren Amin, Third–Party Defendant.**

No. 4:05–cv–00440–JEG.

United States District Court,
S.D. Iowa,
Central Division.

Sept. 20, 2007.

Brian William Hayes, R.J. Zayed, Carlson Caspers Vandenburgh & Lindquist PA, Minneapolis, MN, Larry R. Curtis, Pasley & Singer Law Firm LLP, Ames, IA, for Plaintiffs.

Barry J. Nadler, Debra Lynne Hulett, Randall D. Armentrout, Nyemaster Goode Voigts West Hansell & O'Brien PC, Des Moines, IA, for Defendants.

Debra Lynne Hulett, Randall D. Armentrout, Nyemaster Goode West Hansell & O'Brien, PC, Des Moines, IA, for Third–Party Plaintiffs.

R.J. Zayed, Brian William Hayes, Carlson, Caspers, Vandenburgh & Lindquist, P.A., Minneapolis, MN, Larry R. Curtis, Pasley & Singer Law Firm LLP, Ames, IA, for Third–Party Defendant.

Barry J. Nadler, Debra Lynne Hulett, Randall D. Armentrout, Nyemaster Goode Voigts West Hansell & O'Brien PC, Des Moines, IA, for Counterclaimants.

Larry R. Curtis, Pasley & Singer Law Firm LLP, Ames, IA, Sharon S. Greer, Cartwright Druker & Ryden, Marshalltown, IA, for Counterclaim Defendants.

## ORDER

JAMES E. GRITZNER, District Judge.

This matter is before the Court on Defendants/Counter Claimants/Third–Party Plaintiffs Walter & Associates, L.L.C., and Marvin Walter's Motion for Partial Summary Judgment, and Plaintiffs/Counter Defendants and Third–Party Defendant's Motion for Partial Summary Judgment. Hearing was held on both motions on August 24, 2007. Defendants/Counter Claimants/ Third–Party Plaintiffs were represented by attorney Randall Armentrout. Plaintiffs/Counter Defendants and Third–Party Defendant were represented by attorney Bryan Hayes. The matter is now fully submitted for review.

## RELEVANT PARTIES AND ENTITIES

Plaintiffs Dr. Gene Rouse (Rouse) and Dr. Doyle Wilson (Wilson) were employed by Iowa State University of Science and Technology (ISU). Rouse was employed by ISU between 1971 and June 30, 2004. Rouse was a Professor of Animal Science between 1984 and 2004. Wilson was employed by ISU between 1980 and October 1, 2001. Wilson was an assistant, associate, or full Professor of Animal Science between 1982 and 2001.

Third–Party Defendant Dr. Viren Amin is an Associate Scientist with the ISU Department of Animal Science. Biotronics, Inc., is an Iowa corporation that was formed in 1998 by Wilson, Rouse, Amin, and Craig Hayes.

Defendant Walter & Associates, L.L.C., markets and provides agricultural consulting services through the United States, Canada, and Latin America. Defendant Marvin J. Walter is President and Chairman of Walter & Associates, L.L.C., and was a member of the board of directors of the Iowa State University Research Foundation (ISURF) prior to the formation of Walter & Associates. ISURF is a not-for-profit corporation that is a separate entity from ISU. ISURF owns and licenses ISU's intellectual property. The Office of Intellectual Property and Technology Transfer (OIPTT) at ISU is charged with serving ISU as the vehicle for marketing and licensing intellectual property owned by ISURF. Dr. Kenneth Kirkland is the Executive Director of ISURF and the Director of OIPTT. Nita Lovejoy is the Associate Director of ISURF and OIPTT.

## SUMMARY OF MATERIAL FACTS

Plaintiffs Rouse and Wilson, as research professors at ISU, began a large research project in the late 1980's, researching the ability to use an ultrasound machine to scan cattle in order to determine the quality of the beef on live cattle before the cattle are slaughtered. Rouse and Wilson applied for multiple grants from various entities, including the United States Department of Agriculture, the American Angus Association, and the Beef Industry Council, among others, to fund their research efforts. Rouse and Wilson raised $1.6–million in outside grant funding to support their efforts to explore and research the application of real-time ultrasound technology to predict compositional traits in live beef cattle.

The primary portable scanning device in use at the time the research was being conducted was known as the Aloka. Rouse and Wilson's research was directed generally to the development of ultrasound technology to measure the compositional traits in beef cattle, and the Aloka was the primary scanning device used in one component of this research.

Rouse and Wilson's research resulted in the development of live animal intramuscular fat prediction software (LAIPS). LAIPS was used to predict the degree of intramuscular fat shown on the cattle scans in the lab and contains algorithms that analyze data and provide comprehensive information in terms of the percentage of intramuscular fat. LAIPS takes a scanned image as an input and makes a computation using the algorithms. The initial LAIPS algorithms were designed to work with the Aloka ultrasound device.

Because the LAIPS program arose from the sponsored research, Rouse and Wilson assigned the copyright to the software to ISURF in February of 1995. LAIPS was given ISURF Reference No. 1480. ISU began to license the LAIPS program to third parties in approximately May of 1995. Rouse, Wilson, and Amin, who had assisted Rouse and Wilson during the development of LAIPS, received royalties from ISURF's licensing of the LAIPS software until 2001.

LAIPS requires the use of another software program, a "front-end" interface program, to serve as a user interface and a means to display the images. Rouse, Wilson, and Amin used "PV–WAVE" and "SAS" software programs in conjunction with the LAIPS software. PV–WAVE was used in conjunction with the MF prediction model in the LAIPS software in order to conduct the research. The PV–WAVE was relatively slow compared to other software programs like Rib–O–Matic, which was a front-end program that could be used with LAIPS.

Using a small part of the $1.6–million in grant money, the ISU Department of Animal Science purchased new computers that had increased processor speed and used Microsoft Windows © as an operating system. Rouse and Wilson wanted to develop a Windows © compatible front-end program that could process large numbers of images and asked Amin to develop a front-end program that would allow the LAIPS program to run on the new, faster, Windows ©-based computers. Amin drafted USOFT in response to this request.

In May 1995, while still developing the USOFT program, Amin contacted Evergreen Technologies, Inc., in order to obtain a license for Evergreen's VisionTools software. Amin wanted to use VisionTools in creating USOFT. Amin obtained a license for VisionTools from Evergreen. Pursuant to this license agreement, ISU was granted a nonexclusive, nontransferable license to copy the VisionTools software for the sole purpose of incorporating the software into ISU's programs. The license also permitted the distribution of the software within the departments of the University on a noncommercial basis. The license agreement specifically stated the software "may not be distributed commercially to any person or organization" and further stated that ISU may not use, reproduce, sub-license, distribute, or dispose of the software, in whole or in part, other than as permitted under the license agreement. Amin signed the license agreement as an employee of ISU.

USOFT, developed in 1996, is described as a "front-end" software program for use with the Aloka 500 and Classic 200 intramuscular fat prediction models. USOFT, when used in combination with an intramuscular fat prediction model such as LAIPS, allows for the analysis of real-time ultrasound images collected on live beef cattle to estimate beef carcass composition traits. The USOFT program requires access to the VisionTools libraries in order to be able to return and display meaningful data on a computer screen; thus, VisionTools, while not embedded in the USOFT program, is a necessary component of USOFT. Amin testified during his deposition that USOFT was created to support

the research they were doing into intra-muscular fat and some of the other traits they were researching. Rouse testified during his deposition that Amin alone was the one who wrote the software code but that Rouse and Wilson were involved in calculating and preparing certain algorithms used in the USOFT program. Rouse and Wilson also directed and planned the type of information that would be beneficial to an individual using the software and how to display the information on the screen. Amin programmed the USOFT menu pages with "© Iowa State University" on each screen of the program, resulting in the following being displayed at the top of each screen:

> ### "U–SOFT for Beef Quality Grading (v1.5d 9/17/98) © Iowa State University"[1]

A print-screen depicting a screen displayed by the USOFT software shows the software also displays the following message to users: "This software is developed at Iowa State University (U.S.A.) and copyrighted by the ISU Research Foundation, Inc." Amin testified that he wrote this message into the software. USOFT was never assigned to ISURF in written form, and an express written agreement regarding the ownership of the USOFT copyright does not exist between Plaintiffs and Amin and ISU.

In approximately 1996 or 1997, after USOFT was developed, Amin, Wilson, and Rouse co-authored a research paper entitled "USOFT: an Ultrasound Image Analysis Software for Beef Quality Research" that was published in ISU Beef Research Report. The first page of this research paper says, in part:

> Iowa State University has developed technology for objective evaluation of beef quality by predicting the percentage of intramuscular fat (IMFAT) from ultrasound scans of live animals as well as carcasses. The technology for live animal evaluation has been licensed to a commercial company for field use (A.S. Leaflet R1326, 1996 Beef Research Report). For further research, development and evaluation of this technology, a personal-computer based software has been developed, which is copyrighted by the ISU Research Foundation, Inc.

> The software, USOFT, is an image analysis software designed and developed specifically for processing ultrasound images collected for beef quality grading research. USOFT analyzes images acquired using a real-time ultrasound scanner

> . . . the prediction models used in USOFT are also developed by Iowa State University and are copyrighted by the ISU Research Foundation, Inc.

In July of 1996, pursuant to a Material Transfer and Limited Use License Agreement, ISURF licensed LAIPS and USOFT to the Animal Genetics and Breeding Unit-ed at the University of New England in Armidale, Australia. The Material Transfer Agreement identified the research materials as "Ultrasound Software for Beef Quality Research (U–Soft)/ISURF 01480" and stated the research materials identified were the property of ISURF. Wilson signed this Material Transfer Agreement in July of 1996.

In October of 1997, Rouse, Wilson, and Amin executed a "gold sheet" research proposal for "Centralized Processing of Real Time Ultrasound Images Research Project." A "gold sheet" is an ISU document that ISU researchers must fill out when they are receiving research funding from external sources, such as private companies, the government, or other groups. On this "gold sheet", the re-

---

1. The last dated version was September 17, 1998.

searchers must describe the research, state the source of the research funding, and must also make a statement that they will disclose any intellectual property that results from their research to ISURF.

The funding for the proposed project involved grants from the AAA to ISU in the amount of $200,000 over a two-year period from January 1, 1998, through December 31, 1999. Under the terms of the proposal, Wilson, Rouse, and Amin agreed to develop a centralized ultrasound processing (CUP) laboratory and to develop the structure that would allow for transitioning of the CUP lab to the private sector. As part of the proposal, ISU agreed to make available approximately $63,000 in University resources annually, including faculty, secretarial staff, facilities, and equipment. A "gold sheet" was signed by Rouse and Wilson to ISURF for the Centralized Processing of Real Time Ultrasound Images Research Project. Via this "gold sheet", Rouse and Wilson agreed to assign the rights to any intellectual property arising from the sponsored research to ISURF.

ISU ran the AAA and ISU-sponsored CUP lab from January 1998 through December 1999 in the basement of ISU's Kildee Hall. As part of the two-year research project, the ISU Department of Animal Science developed an intramuscular fat prediction model for the Classic ultrasound scanner. USOFT, which was being used in the CUP lab, was updated by Amin during the time it was in use, but there is no evidence these updates constituted anything more than updates occurring in the normal life of a research software tool. LAIPS was also being used in the CUP lab.

ISURF repeatedly requested disclosures from Rouse and Wilson of newly developed software, but Kirkland testified they were not forthcoming, and he felt that by not responding, he and the ISURF staff were being given the runaround by Rouse and Wilson. Specifically, ISURF had been trying to obtain any updates to LAIPS, as ISURF had licensing agreements with third parties for the use of LAIPS, and pursuant to these licensing agreements, the third parties were entitled to receive copies of any updates to the software. Kirkland testified USOFT was never disclosed to ISURF, and it was his opinion that USOFT should have been disclosed pursuant to ISU policies because it was their belief that University resources had been used to develop the software. Kirkland testified USOFT should have been disclosed to ISURF as soon as the code had been written. Lovejoy testified that ISURF staff expected USOFT would be disclosed to ISURF, but it never was, despite requests from ISURF for a disclosure. Lovejoy believes USOFT belonged to ISU.

After the AAA–ISU sponsored project ended, the CUP lab continued to operate in the basement of Kildee Hall throughout the year of 2000. Due to the volume of scans the CUP lab was processing, in 2000 ISU became concerned their CUP lab would be competing with private industry, so the decision was made to transition the CUP lab from ISU to the private sector. Defendant Marvin Walter was approached to take the CUP lab into the private sector. ISURF, the entity responsible for handling the licensing of intellectual property for ISU, became involved in the negotiation of a licensing agreement to Walter & Associates. ISURF asked Wilson for a list of all of the hardware and software that would be needed to transition the CUP lab to Marvin Walter, and Wilson drafted such a list. USOFT was on the list among various other software programs, and Amin was listed as the contact person for USOFT. Lovejoy states she discussed with Amin the USOFT software and that Amin informed her USOFT was

"free to anyone who wants it." Lovejoy contemporaneously made a notation of such on a copy of the list of software Wilson had drafted (Pls.' App. 150). Lovejoy, on behalf of ISURF, represented to Marvin Walter that the licensing agreement would include software that had everything needed to operate the CUP lab in the private setting.

The licensing agreement was signed in early 2001. The Software License Agreement (SLA) specifically defined the term "software" as used in the SLA as follows:

"Software" shall mean the computer program in machine readable object code and source code identified as Live Animal Intramuscular Percentage Fat Prediction Software (LAIPS) which is docketed as ISURF 01480 and developed at Iowa State University and any subsequent error corrections or updates supplied to LICENSEE by ISURF pursuant to this Agreement.

A package of software, which included the USOFT program, was delivered to Walter & Associates, and Walter & Associates began using the software and operating for profit in the private sector doing the same ultrasound scanning of cattle that had been done at ISU. The parties do not dispute that when Walter & Associates was formed, it leased several personal computers from Iowa State University's Department of Animal Science in order to get the CUP laboratory up and running; these computers contained copies of the USOFT and VisionTools software programs on their hard drives. This distribution of the VisionTools software to Walter & Associates constituted a breach of the specific terms of the license agreement ISU had entered into with Evergreen Technologies.

Walter & Associates used USOFT to interpret both Aloka and Classic scans in 2001–2002. Walter & Associates licensed different software to be used with a new version of the Aloka scanner, thus Walter & Associates did not use USOFT as an interface for LAIPS on the Aloka scans after December 21, 2002. Walter & Associates continued to used USOFT as the interface program for LAIPS in processing the Classic scans from 2001 to the end of 2006.

In 2002, Rouse, Wilson, and Amin, through their company, Biotronics, decided to establish a commercial business and compete in the ultrasound market. Biotronics would thus be directly competing with Walter & Associates. Biotronics does not use USOFT in the course of its ultrasound business.

In January 2005, Rouse and Wilson drafted a letter to Kirkland, asserting for the first time that they, along with Amin, were the exclusive owners of USOFT. On April 14, 2005, counsel for Rouse and Wilson sent a letter to Kirkland requesting that he sign a form admitting that Rouse, Wilson, and Amin, and not ISURF, were the owners of USOFT. Kirkland refused to sign the document and testified he did not sign the form because he did not believe Rouse, Wilson, and Amin owned USOFT due to the existence of third-party software in USOFT. On May 6, 2005, Kirkland sent a letter to counsel for Rouse and Wilson that stated, "In response to the above memo, I acknowledge that the Iowa State University Research Foundation, Inc. does not own the copyright to the USOFT software."

On approximately May 6, 2005, Lovejoy spoke with Amin, who indicated he would speak to Rouse and Wilson about their opinion on placing USOFT in the public domain. Amin was concerned about liability related to the third-party software, VisionTools, and wanted some assurances ISU would protect him from any liability related to any misuse of VisionTools. On May 11, 2005, Rouse, Wilson, and Amin

signed an Agreement Between Joint Owners that stated they are the joint owners of all right, title, and interest in the copyright to the USOFT software program. On June 8, 2005, Wilson, Rouse, and Amin filed a Certificate of Registration with the United States Copyright Office for the USOFT program. The copyright was registered on June 9, 2005. At some time during 2005, prior to the filing of the present suit, Rouse and Wilson sent a cease and desist letter to Walter, claiming USOFT was independently owned by them. Walter & Associates refused to discontinue their use of the USOFT program.[2]

## PROCEDURAL HISTORY

On August 1, 2005, Plaintiffs (Rouse and Wilson) filed a Complaint against Walter & Associates alleging a single claim of copyright infringement based on Walter & Associates' use of the USOFT software. On August 31, 2005, Walter & Associates filed an Answer and included counterclaims against Rouse, Wilson, and Biotronics for declaratory judgment, tortious interference with contract, tortious interference with prospective business relationship, and slander per se. On January 30, 2006, Plaintiffs filed a First Amended Complaint, adding Marvin Walter as a defendant. On February 20, 2006, Defendants (Walter & Associates and Walter) filed an Answer to the First Amended Complaint and again asserted the same counterclaims against Rouse, Wilson, and Biotronics. On September 20, 2006, Defendants filed a Motion for Leave to Amend Answer and File Third–Party Complaint, which Plaintiffs resisted. Hearing was held on the matter on October 4, 2006, and Magistrate Judge Celeste Bremer determined that Defendants had established good cause to allow the Amended Answer to be filed. The Amended Answer was filed on October 9, 2006, and added Amin as a necessary party to the declaratory judgment claim; added a claim of negligent misrepresentation against Rouse and Wilson; added ISURF as a third-party defendant based on claims of fraud, negligent misrepresentation, breach of contract, and indemnity; and conformed its counterclaim to the information Defendants had subsequently learned during the course of discovery.

On November 9, 2006, Defendants filed an Unresisted Motion for Leave to File Second Amended Answer seeking to amend its answer to clarify its answer to paragraph 20 of the First Amended Complaint and to remove the affirmative defense that the copyright at issue has been assigned. The motion was granted on November 20, 2006, and the Second Amended Answer was filed on December 11, 2006.[3]

Rouse and Wilson were deposed on February 5 and 6, 2007. It was during these depositions that Defendants learned Rouse and Wilson had provided ISURF with a list of software programs that could be used to operate a CUP lab. At some time after these depositions took place, Defendants learned that on January 2, 2001, Nita Lovejoy of ISURF had contacted Amin regarding obtaining USOFT for use in Walter & Associates' CUP lab. Lovejoy states in her February 9, 2007, affidavit that Amin represented to her that USOFT was "free to anyone who wants it."

On February 9, 2007, Defendants/Third–Party Plaintiffs Walter & Associates and Marvin Walter and Third–Party Defendant ISURF filed a Joint Mo-

---

**2.** On April 26, 2006, Walter & Associates obtained permission from Evergreen Technologies to use VisionTools in Walter & Associates' commercial venture.

**3.** There is no explanation regarding why it took the Clerk's Office three weeks to file the Second Amended Answer per the Court's order.

tion for Dismissal With Prejudice, pursuant to a settlement agreement these parties had entered.[4] The Court granted the Joint Motion for Dismissal with Prejudice on February 12, 2007, and Third–Party Defendant ISURF was dismissed from the case with prejudice.

On March 23, 2007, Defendants filed a Motion to Dismiss and for Leave to File Third Amended Answer arguing that their recent discovery that Amin was the person who represented USOFT was in the public domain necessitated amendments to their Answer to the First Amended Complaint. Specifically, Defendants requested leave to do the following: amend the answer to paragraph 20 of Plaintiffs' First Amended Complaint to account for recent changes in Walter & Associates' use of USOFT; add as an affirmative defense that the USOFT copyright owner assigned the USOFT copyright to Walter & Associates; add to the Third–Party Complaint a claim of negligent misrepresentation against Amin; dismiss Biotronics as a party; and dismiss the counterclaims of tortious interference with contract, tortious interference with prospective business relationship, and slander per se against Rouse and Wilson. On May 9, 2007, the counterclaims of tortious interference with contract, tortious interference with prospective business relationship, and slander per se against Gene Rouse and Doyle Wilson were dismissed with prejudice. The claim against Third–Party Defendant Biotronics, Inc., was also dismissed with prejudice. Defendants' Motion For Leave to Amend was granted, and the Third Amended Answer to Plaintiffs' First Amended Complaint was filed on May 22, 2007.

In the Third Amended Answer to Plaintiffs' First Amended Complaint, Defendants denied the allegations contained in Plaintiffs' First Amended Complaint and set forth counter claims seeking a declaratory judgment that Walter & Associates has not infringed any copyright of Rouse, Wilson, or Amin, and asserting a counterclaim of negligent misrepresentation against Rouse and Wilson. Defendants also set forth a Third–Party Complaint against Amin, seeking a declaratory judgment and including a claim of negligent misrepresentation.

On May 1, 2007, Defendants filed a Motion for Partial Summary Judgment contending that Rouse and Wilson's claims for copyright infringement must be dismissed because Rouse and Wilson cannot establish as a matter of law that USOFT is an expression of their creation, rather than merely their idea, which is not subject to copyright protection, and that USOFT was created by Amin, Rouse, and Wilson within the scope of their employment at ISU and thus is owned by ISU as work made for hire. Rouse, Wilson, and Amin have resisted this Motion for Partial Summary Judgment.

---

4. On February 9, 2007, Nita Lovejoy assigned all of ISU's right, title, interest, and claim in USOFT to Walter & Associates. The assignment specifically states, in relevant part,

 Whereas, image analysis software designed for processing ultrasound images collected for beef quality grading research, known as LAIPS and USOFT (or "U–Soft") was developed at Iowa State University by employees of Iowa State University ...

 Whereas, on January 4, 2001, OIPTT believed that, with the exception of LAIPS, the components of the system required to operate the CUP lab, including USOFT, were publicly available through Iowa State University and/or commercial sources ...

 Whereas, on information and belief, neither Iowa State University nor ISURF have agreed in a written instrument to transfer ownership of USOFT ...

 Whereas, Iowa State University has not assigned USOFT to ISURF and has not applied for copyright of USOFT ...

On May 8, 2007, Rouse, Wilson, and Amin filed a Motion for Partial Summary Judgment asserting Defendants' claims of negligent misrepresentation against them must be dismissed because as a matter of law they did not and do not owe Defendants a duty of care, a necessary element in any claim for negligent misrepresentation. Defendants have resisted this Motion for Partial Summary Judgment, contending a duty of care did exist.

## APPLICABLE LAW AND DISCUSSION

### Motion for Summary Judgment

#### Standard of Review

"[C]laims lacking merit may be dealt with through summary judgment under Rule 56." *Swierkiewicz v. Sorema*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Summary judgment is a drastic remedy, and the Eighth Circuit has recognized that it "must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1118 (8th Cir.2006) (quotation omitted). However, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," judgment should be rendered. Fed. R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *P & O Nedlloyd, Ltd. v. Sanderson Farms, Inc.*, 462 F.3d 1015, 1018 (8th Cir.2006).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Heisler v. Metro. Council*, 339 F.3d 622, 631 (8th Cir.2003) (quoting *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548). "If the moving party has carried its burden, the nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial." *Winthrop Resources Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir.2004). The court gives the nonmoving party the benefit of all reasonable inferences and views the facts in the light most favorable to that party. *Liberty Mut. Fire Ins. Co. v. Scott*, 486 F.3d 418, 422 (8th Cir.2007); *de Llano v. Berglund*, 282 F.3d 1031, 1034 (8th Cir.2002).

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Hayek v. City of St. Paul*, 488 F.3d 1049, 1054 (8th Cir.2007) (citing *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1006 (8th Cir. 2005)). Summary judgment should not be granted if the court can conclude that a reasonable trier of fact could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005) ("If a reasonable jury could return a verdict for the non-moving party based on the evidence presented, summary judgment is inappropriate."). In light of these standards, the Court considers the present motion.

## DEFENDANTS/COUNTER CLAIMANTS/THIRD–PARTY PLAINTIFFS WALTER & ASSOCIATES, L.L.C., AND MARVIN WALTER'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants argue that Rouse and Wilson's claims for copyright infringement against Walter & Associates and Walter must be dismissed because (1) Rouse and Wilson cannot establish as a matter of law that USOFT is an expression of their cre-

ation, rather than merely their idea, which is not subject to copyright protection; (2) USOFT was created by Amin, Rouse, and Wilson within the scope of their employment at ISU and thus is owned by ISU as work made for hire; (3) USOFT is a method of operating other software and thus is not entitled to copyright protection; (4) Rouse and Wilson's delay in asserting their claim of ownership precludes an award of damages based on laches; (5) they are barred from recovering damages for any alleged infringement occurring prior to August 1, 2002, by virtue of the statute of limitations contained within 17 U.S.C. § 507(b); (6) Rouse, Wilson, and Amin are estopped from obtaining relief under the Copyright Act; and (7) they have abandoned their alleged ownership right for the copyright for USOFT.

## I. OWNERSHIP OF A VALID COPYRIGHT UNDER THE COPYRIGHT ACT.

■ In order to establish a copyright infringement claim, a plaintiff is required to establish (1) ownership of a valid copyright, and (2) copying of original elements. *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726, 731 (8th Cir.2006). There is no dispute that copying of USOFT took place. Defendants argue Rouse and Wilson do not have standing to sue for infringement because they lack ownership, as they did not create USOFT and it has not been assigned to them, ISU owns USOFT as a work made for hire, and there is no written agreement from ISU granting ownership in Rouse, Wilson, or Amin.

### A. Standing to Sue For Infringement.

Only "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled ... to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). "As a general rule,

the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. For Creative Non–Violence v. Reid*, 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). "A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101.

There is no requirement that "the several authors must necessarily work in physical propinquity, or in concert, nor that the respective contributions made by each joint author must be equal either in quantity or quality." Nimmer on Copyright § 6.03, at 7. Each author's contribution, however, must be more than *de minimis*. *Id.* § 6.07[A][1], at 21.

*Baker v. Robert I. Lappin Charitable Found.*, 415 F.Supp.2d 473, 487 (S.D.N.Y. 2006). Defendants contend it is undisputed that Rouse and Wilson did not write any part of USOFT and that Amin wrote all of the code to USOFT, and therefore they do not have standing to sue for infringement. Defendants contend that simply having the "idea" for the software or explaining the process to another is insufficient to establish a copyrightable ownership interest because the Copyright Act does not protect "facts or ideas" but instead protects the expression of those ideas, arguing that while computer software can obtain copyright protection, this protection extends only to the "literal" elements of the software, such as its source code, and may extend to "nonliteral" elements such as its structure, sequence, organization, user interface, screen displays, and menu structures. Defendants contend that because no part of Rouse or Wilson's contribution to USOFT constitutes the actual expression of the software, they lack

standing under the Act to assert ownership.

Defendants contend Rouse and Wilson attempted to manufacture standing for themselves by signing a document dated May 11, 2005, and entitled "Agreement Between Joint Owners" with Amin, the actual creator of USOFT. Defendants argue the Agreement is not a valid assignment of ownership of intellectual property in the software because Rouse and Wilson admit they gave Amin no consideration for the Agreement, and the Agreement would not confer a copyrightable interest from Amin to Rouse and Wilson because Amin created USOFT within the scope of his employment with ISU; thus USOFT is owned by ISU as work made for hire.

Rouse and Wilson contend the argument regarding the May 11, 2005, Agreement Between Joint Owners is irrelevant and this agreement was not concluded because of any concerns over standing to sue or transfer of ownership. Instead, Rouse and Wilson contend the evidence demonstrates that they wanted to confirm their rights in an agreement in order to prevent independent action because Amin had been pressured by ISURF to place USOFT in the public domain. Rouse and Wilson assert that because they, along with Amin, have always been joint owners to the copyright in the USOFT program, the May 11, 2005, Agreement did not alter or assign any amount of ownership.

Rouse testified he did not do anything with regard to the drafting of the USOFT software and that Amin wrote the actual lines of code for USOFT. Wilson also testified that he did not have anything to do with the actual writing of the code for USOFT and that Amin wrote the lines of code for USOFT. Wilson testified he did not believe he could have personally applied for registration of the USOFT copyright without entering into a joint owner agreement with Amin and that neither he nor Rouse gave Amin any consideration for this joint owner agreement.

Rouse and Wilson dispute they were not joint creators of USOFT. Wilson testified he oversaw the development of USOFT by indicating the type of information that would be useful to an individual using the software, how to display information on the screen, and that he worked with Amin in the development of USOFT. Rouse testified he believed he had some ownership interest in USOFT because Amin was working at the direction of Rouse and Wilson, and they instructed Amin and gave him the idea to write USOFT.

Rouse testified his involvement was mainly putting together a flow chart on how the program needed to function and what it needed to say or do, and that he helped develop underlying algorithms or mathematics that would be used to calculate the formulas in predicting intramuscular fat. It is not entirely clear whether Rouse was referring to LAIPS or USOFT when giving this testimony; however, as the nonmoving party, Plaintiffs are entitled to all favorable inferences. Rouse testified that with respect to USOFT, he oversaw the development of the software and indicated the type of information that would be useful to an individual using the software and how to display the information on the screen. Amin testified that Rouse and Wilson helped define the algorithms he would implement in the source code for USOFT and that while he did the final typing of the source code, the algorithm task needed the specialty of Rouse and Wilson. Amin stated in his declaration that Rouse and Wilson worked closely with him in calculating and preparing certain algorithms used in the USOFT program, which he then inputted directly into the source code, stating that he was not an expert in those areas of ultrasound technology. Amin stated Rouse and Wilson

also assisted him in designing and planning the type of information that would be useful to an individual using the software, how to display information on the screen, and that in sum they worked with him throughout the development of USOFT.

■■■ Copyright law only protects expression, and not ideas or facts. *Schoolhouse, Inc. v. Anderson*, 275 F.3d 726, 728 (8th Cir.2002).

> It is settled that computer programs are entitled to copyright protection. This protection extends not only to the "literal" elements of computer software—the source code and object code—but also to a program's nonliteral elements, including its structure, sequence, organization, user interface, screen displays, and menu structures.

*Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 142 (5th Cir.2004). "Whether a particular component of a program is protected by a copyright depends on whether it qualifies as an 'expression' of an idea, rather than the idea itself." *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1175 (9th Cir.1989) (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 207–08 (9th Cir.1988); 17 U.S.C. § 102(b)).

> Source and object code, the literal components of a program, are consistently held protected by a copyright on the program. *See, e.g., CMS Software Design Sys., Inc. v. Info Designs, Inc.*, 785 F.2d 1246, 1249 (5th Cir.1986) (source code); *Apple Computer, Inc. v. Formula Intern., Inc.*, 725 F.2d 521, 525 (9th Cir. 1984) (object code). Whether the nonliteral components of a program, including the structure, sequence and organization and user interface, are protected depends on whether, on the particular facts of each case, the component in

question qualifies as an expression of an idea, or an idea itself.

*Id.* The testimony of Wilson, Rouse, and Amin indicates the development of USOFT was a collaborative process, with Wilson and Rouse directing Amin, who was doing the actual drafting and typing of the software program. Considering the facts in the light most favorable to Rouse and Wilson, the Court cannot decide as a matter of law that Plaintiffs did not co-author some protectable interest in the USOFT program with Amin. However, under the circumstances of this case, a finding that Rouse and Wilson co-authored the work with Amin does not end the inquiry regarding standing because the analysis continues into the "work for hire" doctrine, as that doctrine ultimately determines the "author" of a work for purposes of the Copyright Act.

**B. Work Made for Hire.**

"Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are [co-owners] of copyright in the work." 17 U.S.C. § 201(a). "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have *expressly* agreed otherwise in a *written instrument signed by them,* owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b) (emphasis added). Defendants assert that ISU owns the copyright to USOFT as work made for hire. Rouse, Wilson, and Amin contend the work-for-hire doctrine does not apply in this case because Rouse, Wilson, and Amin expressly agreed otherwise in a written instrument.

Plaintiffs contend that at the commencement of their employment with ISU, they signed a "letter of intent" with the University that expressly incorporated into the

letter of intent the ISU Faculty Handbook, and that this Faculty Handbook contains a policy that vests ownership rights in the authors unless assigned to ISURF. Plaintiffs further contend that even if the work-for-hire doctrine could apply in this case, the required elements are not met, and disputed issues of material fact exist that preclude summary judgment on the issue of work for hire.

 The Court must therefore examine whether USOFT was "work for hire" and if so whether an express written agreement regarding the ownership of its copyright exists. In analyzing whether a creation constitutes work made for hire, the Court examines three factors.

> As expressed in Section 228 of the *Restatement*, the key principle is that a servant's conduct is within the scope of employment "only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master."

*Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir.1994). The Court will address each of these three factors in turn.

### 1. Was the work of the kind Amin, Rouse and Wilson were employed to perform?

Defendants assert that as ISU tenured faculty, Rouse and Wilson were expected to and did in fact engage in research activities. Rouse and Wilson argue that the creation of USOFT was not the kind of work they were expected to perform.

Rouse testified that he and Wilson devoted approximately fifteen years of their ISU careers working on the research project relating to the prediction of intramuscular fat in live cattle, bringing in over $1.6–million in sponsored research funding to support such work. Rouse's curriculum vitae shows that since as early as 1995 he has published numerous scholarly articles pertaining to real-time ultrasound image processing in relation to predicting intramuscular fat in beef cattle. Wilson's curriculum vitae similarly shows he has published numerous articles during his tenure with ISU regarding the ultrasound imaging of intramuscular fat of beef cattle. Wilson testified that there were two major research projects he worked on when he worked for ISU. One research project centered on helping the Department of Animal Science develop a breeding project, with the focus of that research being to develop two genetically diverse lines of beef cattle. Wilson testified the technology used in that research was based upon ultrasound technology. Complementary to that research was the development of ultrasound technology to measure compositional traits in beef cattle.

Rouse testified that at some point they determined they had to write some front-end software for LAIPS if they were going to process large numbers of images, and this front-end software is what is now known as USOFT. The record shows that using a small portion of the $1.6–million in research funding, new Windows ©-based computers were purchased for use in the research project, and thus a need arose for Windows © compatible front-end software that would allow the researchers to process larger numbers of images at a faster pace on these new computers. Rouse testified he instructed Amin to put the USOFT software together on a Windows ©-based platform. Rouse testified the code itself would speed up the process and the fact that it ran on a computer with a faster processor would speed up the process. Rouse testified USOFT was a front-end program that would help them interpret the LAIPS program quicker but that it was not used directly to predict intramuscular fat; LAIPS performed that function. Rouse testified that when a large

number of images are brought in and interpreted with LAIPS, USOFT helps bring those images in and line them up so an individual can generate the actual percent of intramuscular fat faster. Wilson testified Amin developed USOFT to assist and support Wilson and Rouse in their research at ISU and to speed up their research process.

Amin testified he began working with the Department of Animal Science after he graduated in 1992, working on beef ultrasound, and that he was still working in the Department of Animal Science when he was developing USOFT. Amin testified that he did research, developed algorithms to analyze the images, assisted in developing a procedure to derive information out of the images, assisted in scanning the images and, wrote source codes. Amin also assisted in making improvements to the LAIPS software program, and he developed a program to interpret images from the Classic scanner. Although Amin stated in his May 24, 2007, declaration that his position was "as a scientist, not a programmer," this more recent declaration contradicts not only Amin's own deposition testimony that in performing work for the Department of Animal Science he had programmed software, but also his own curriculum vitae, in which he included, under the header "Primary areas of interest and expertise," "computer based system and software development for bio-medical and agricultural imaging applications," and under the header "Other Professional Activities," "Developed USOFT and related software products for animal ultrasound researchers."

Given these facts, there exists no genuine issue of material fact that the development of USOFT was within the scope of duties Amin was hired to perform. Amin testified USOFT was developed to support the research they were doing into intramuscular fat and some of the other compo-

sitional traits, such as how to measure the depth and area of the fat. Amin testified USOFT allowed them to do their research at ISU in a particular way.

Rouse and Wilson argue that although part of Amin's salary was paid by grant funding, this salary was paid for his work as a scientist, not as a computer programmer. Courts have found that although not hired to program software, where the development of software occurred within the scope of the employee's employment it can be deemed work of the kind the employee was hired to perform. *See Genzmer v. Public Health Trust of Miami–Dade County,* 219 F.Supp.2d 1275, 1280–81 (S.D.Fla.2002) (employee was required to undertake a research assignment that encompassed "a myriad of activities" and the evidence showed that at times such research included the drafting of computer programs); *Miller v. CP Chemicals, Inc.,* 808 F.Supp. 1238, 1243 (D.S.C.1992) (although employee not hired primarily to develop software, the development of computer programs was at least incidental to his job responsibilities because he was responsible for the organizing and updating the laboratory).

An Iowa State University Proposal Data Form signed by Rouse, Wilson, and Amin on October 9, 1997, shows the three proposed a project entitled "Centralized Processing of Real Time Ultrasound Images Research Project." The project was approved by the University. There is overwhelming testimony in the record from Wilson, Rouse, and Amin that Wilson and Rouse directed Amin to develop a front-end program, USOFT, in order to provide them with a faster interface for the LAIPS software. This faster interface for LAIPS would certainly assist Rouse and Wilson in continuing their ultrasound research project at ISU and allow them to run the ultrasound processing laboratory more ef-

ficiently based on the ability to process the images more quickly. Further, ISURF licensed USOFT, along with LAIPS, to a third party, evidence that USOFT was important to the process of ultrasound imaging and clearly integral to the work and an obvious part of the research task. The Court concludes Plaintiffs have failed to generate a genuine issue of material fact regarding whether directing Amin to develop USOFT, and assisting him in that development, was the type of work Rouse and Wilson were employed to perform. Plaintiffs have also failed to generate a genuine issue of material fact on the issue of whether drafting USOFT at the directive of the professors and creating the software with their assistance was of the type of work Amin was expected to perform at ISU.

### 2. Did the work of Amin, Rouse, and Wilson occur substantially within authorized time and space limits?

Rouse, Wilson, and Amin contend the development of USOFT did not occur substantially within authorized space and time limits, asserting Amin used his own personal computer at home for the "vast" majority of programming the USOFT program.

■ An employee cannot establish copyright ownership rights solely on the basis that the work was done at home on off-hours. *Avtec Sys., Inc.*, 21 F.3d at 571.

> Neither case law nor the legislative history suggests that a person can avoid the "work made for hire" doctrine merely by preparing the work during non-working hours or in a facility not controlled by the employer. The mere fact that preparations were done outside an employee's office or normal working hours does not remove such preparations from the scope of employment.

*Marshall v. Miles Labs., Inc.*, 647 F.Supp. 1326, 1330 (N.D.Ind.1986); *see also In re*

*Simplified Info. Sys., Inc.*, 89 B.R. 538, 542 (W.D.Pa.1988) (citing *Marshall*, 647 F.Supp. at 1330) ("[T]he 'work made for hire' doctrine is not avoidable merely by performing the work in a separate location, or on non-work time."); *Vanderhurst v. Colorado Mountain Coll. Dist.*, 16 F.Supp.2d 1297, 1307 (D.Colo.1998) (concluding that even though the outline was prepared on the employee's own time and using his own materials, it was clearly connected directly with the work for which he was hired to perform, and therefore it was work for hire and did not belong to the employee).

Rouse and Wilson contend that James Bloedel, ISU's Vice Provost for Research & Advanced Studies, sent Marvin Walter an email on September 5, 2002, that stated, "We cannot find any usable direct evidence that the product in question was developed with on-campus facilities or that the University's farm animals were used in the testing." (Pls.' Res.App. 176). However, the record indicates Bloedel was not referring to USOFT in making this statement; he was referring to new software created by Biotronics, the subject of an August 28, 2002, email inquiry from Lovejoy that had prompted Bloedel's response to Walter. Amin has admitted he used on-campus computers both to develop and test the USOFT program.

Amin testified it was normal for him to perform his work both at ISU and at home, and when working on developing USOFT, he worked both at ISU and at home. Amin further testified that when he was working on USOFT at ISU, he would be working on ISU computers. Wilson also testified that some of the actual writing of the USOFT code was done with the computers at ISU. Amin testified that while he was working on the research project for Wilson and Rouse, he was a salaried employee of ISU. He further testi-

fied the testing of USOFT *must* have occurred at ISU's Department of Animal Science because he did not keep a copy of the LAIPS program at his home, and LAIPS would have been necessary in testing how USOFT functioned.

The facts of this case are strikingly similar to those of *Genzmer v. Public Health Trust of Miami–Dade County*. In that case, Genzmer contended he wrote the software at issue at his home, using his home computer, during off-duty hours. *Genzmer*, 219 F.Supp.2d at 1281–1282. In finding Genzmer's work occurred substantially within the authorized time and space limits, the court noted Genzmer was a salaried employee involved in a research project and stated what mattered was that he performed the work on the software during the time period in which he had been employed to complete the research program. *Id.* at 1282. The court also found it was important that Genzmer tested the computer program using the employer's resources. *Id.*

The USOFT program was developed and tested on ISU computers, and because USOFT utilized the VisionTools software, pursuant to the VisionTools Noncommercial Run–Time Software Distribution Agreement between Evergreen Technologies and ISU, the VisionTools software could not be distributed to any computer system other than ISU's computer system. Indeed, both Rouse and Wilson testified USOFT was not operational unless it had VisionTools attached to it, and USOFT required the VisionTools libraries to operate. The source code for USOFT is kept at the Department of Animal Science.

In arguing the creation of USOFT did not occur substantially within authorized time and space limits, Plaintiffs argue ISURF has a specific disclosure form for (1) inventions arising in the employees' work, (2) research that has "used significant university resources", or (3) research

that has a commercial application, and that no such disclosure form was submitted to ISURF for the USOFT program. It is undisputed that no disclosure form regarding USOFT was ever given to ISURF. Section 3.1(2) of ISU's Personnel Policy states, "Faculty members have the responsibility of disclosing intellectual property in a timely fashion when it arises in their work." Defs.' App. 63. The lack of a disclosure form simply means Plaintiffs, the individuals who would have been responsible for completing such a disclosure form, never gave such a form to ISURF. Plaintiffs may not rely on their own failure to complete the requisite disclosure form as evidence that USOFT was not the type of invention subject to a disclosure form under ISU policies, and the lack of the requisite disclosure form does not generate a *genuine* issue of material fact.

Rouse, Wilson, and Amin make the same argument regarding the absence of a "gold sheet" that specifically pertained to USOFT. This argument is without merit because, again, Rouse, Wilson, and Amin would have been the ones responsible for generating a gold sheet; thus, contrary to the assertions of Plaintiffs, the fact that one does not exist that specifically indicates "USOFT" as the funded research project does not generate a fact issue that USOFT was not created substantially within the authorized time and space limits of the job.

The USOFT program was developed and tested on ISU computers. Rouse and Wilson testified they would direct Amin in the development of USOFT, and they wrote specific algorithms for inclusion into the USOFT program. Rouse and Wilson were paid faculty members during the time USOFT was being developed, and they were leading the research project for which USOFT would be utilized as an interface with LAIPS, the integral software

program involved in the ultrasound imaging of the intramuscular composition of the beef cattle. Amin admits that while he sometimes worked on USOFT at his home, using his home computer, during off-duty hours, he also used ISU computers to develop, write, and test the USOFT code. Amin was a salaried employee involved in a research project, and he developed USOFT during the time period in which he had been employed to complete the research program. There exists no genuine issue regarding whether the development of USOFT occurred substantially within authorized time and space limits.

### 3. Were Amin, Rouse, and Wilson actuated at least in part by a purpose to serve the master?

Plaintiffs contend the evidence indicates they were self-motivated to create the USOFT program and that further ultrasound research did not require the development of new interface software. Indeed, the record shows that *further* ultrasound research did not require the development of a new interface; however, *faster* ultrasound research did necessitate that a new Windows ©-based interface be developed.

■ "[T]he *Restatement* does not require that the servant's only motivation be to help his or her employer; the motivation need only be partial." *Genzmer*, 219 F.Supp.2d at 1282; *see also City of Newark v. Beasley*, 883 F.Supp. 3, 9 (D.N.J. 1995) (employer only required to prove that employee was at least "appreciably" motivated by a desire to further the goals of his employer). Conduct may be considered within the scope of employment even when done in part to serve the purposes of the employee, or a third party. Restatement (Second) of Agency § 236 (1958).

Rouse testified that he and Wilson spent approximately fifteen years of their careers at ISU on the development of soft-

ware to predict intramuscular fat on live cattle. Wilson similarly testified that the majority of their research was in this area. The record also reveals that in 1997, Rouse, Wilson, and Amin co-authored a published article in ISU's Beef Research Reports publication entitled "USOFT: An Ultrasound Image Analysis Software for Beef Quality Research." The article states as follows, in pertinent part:

> Iowa State University has developed technology for objective evaluation of beef quality by predicting the percentage of intramuscular fat (IMFAT) from ultrasound scans of live animals as well as carcasses. The technology for live animal evaluation has been licensed to a commercial company for field use (A.S. Leaflet R1326, 1996 Beef Research Report). For further research, development and evaluation of this technology, a personal-computer based software has been developed, which is copyrighted by the ISU Research Foundation, Inc.
>
> The software, USOFT, is an image analysis software designed and developed specifically for processing ultrasound images collected for beef quality grading research. USOFT analyzes images acquired using a real-time ultrasound scanner ... the prediction models used in USOFT are also developed by Iowa State University and are copyrighted by the ISU Research Foundation, Inc.

Defs.' App. 365. Plaintiffs argue the article's reference to the software copyrighted by ISURF was with respect to LAIPS, but the plain language of the article speaks for itself. The article evidences USOFT was part of the research that was being conducted for ISU.

As previously discussed, Rouse and Wilson testified they directed Amin to develop USOFT because they wanted a front-end program to use on the Windows ©-based computers that would allow for a faster

interface to process larger numbers of images. USOFT permitted them to conduct the intramuscular fat research in a particular way and allowed them to speed up the processing of large numbers of images, which certainly assisted in their research at the centralized ultrasound processing laboratory. Further, the evidence clearly shows that Amin inserted into USOFT code lines which state, "U–SOFT for Beef Quality Grading (v1.5d 9/17/98) © Iowa State University." Defs.' App. 371–381. Amin further included in the USOFT program a screen that specifically states, "This software is developed at Iowa State University (U.S.A.) and copyrighted by the ISU Research Foundation, Inc. No part of this software should be copied in any form without written permission of the copyright holder." Defs.' App. 373. Amin admits he wrote that into the program. Plaintiffs argue these copyright statements were included in USOFT to protect the proprietary LAIPS software, but this argument runs contrary to Plaintiffs' own assertion that USOFT and LAIPS were separate and distinct and that USOFT was capable of functioning with any program that has the appropriate MF prediction models. While the statements regarding an ISU copyright were technically inaccurate at that time, the references strongly demonstrate the understanding of the parties prior to any advocacy in the context of later claims and litigation.

The record shows there is no genuine issue regarding whether Rouse, Wilson, and Amin were motivated at least in material part by a desire to further the research of the ISU Department of Animal Science by creating a front-end software program that would allow the CUP lab to process larger numbers of images at a faster pace, increasing the functionality of LAIPS on a larger scale.

Rouse and Wilson were employed as faculty members of ISU and dedicated fifteen years to the development of ultrasound imaging of intramuscular fat on live beef cattle. Part of this research included such activities as developing algorithms for software and creating software programs to assist in the imaging and processing of the images. Indeed, it is undisputed that Rouse and Wilson created the LAIPS software as part of this research, and it is disputed that Rouse and Wilson directed Amin to develop USOFT for use with LAIPS on the Windows ©-based ISU computers. While Amin testified that some of the time he worked on USOFT at home, using his home computer, such information is not dispositive on the issue. Amin admitted he also worked on USOFT using ISU computers; in fact, he had to use ISU resources to test USOFT because Amin did not have a copy of LAIPS on his home computer to run in order to demonstrate how USOFT would interact with LAIPS. USOFT was developed to assist the LAIPS software in processing on ISU's faster, Windows © -based computers, and the use of LAIPS was integral to the ultrasound imaging of the intramuscular fat research. Plaintiffs have failed to generate a genuine issue of material fact regarding whether USOFT was work made for hire.

## C. Is There a Written Document Establishing Amin, Rouse, and Wilson as Owners of USOFT?

■ Where work is deemed "work made for hire", under the Copyright Act such work automatically vests with the employer unless an express, written agreement between the employer and employee exists.

In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have *expressly* agreed otherwise in a written instrument signed

by them, owns all of the rights comprised in the copyright.

17 U.S.C. § 201(b) (emphasis added). Rouse and Wilson assert they do have such a written instrument, arguing that at the time they began their employment, they signed a letter of intent with ISU. Rouse and Wilson contend this letter of intent expressly incorporated the ISU Faculty Handbook policy, stating, "I understand that this agreement is in accordance with the policies contained in the Iowa State University Faculty Handbook and I accept the position described above." Specifically, Plaintiffs contend that Sections 8.3.6.3 and 8.3.6.5 constitute the written agreement that exempts them from the work-for-hire doctrine.

The Faculty Handbook states, "The Faculty Handbook is the official statement of Iowa State University policy governing the rights, responsibilities, and performance of faculty." Section 8.3.6.5 of the Faculty Handbook is entitled "Policies." This section states as follows:

### 8.3.6.3. Policies

Iowa State University encourages the development of educational materials to assist in meeting its responsibilities for academic instruction, extension, and research.

The university encouragement is provided by assistance in the preparation of such materials (through salary support, stenographic services, materials and supplies, art work, filming, and other services) as authorized by the appropriate administrative officer(s).

The university recognizes the vested rights of an author under the Iowa Code. However, if the educational materials are to be developed with university sponsorship, the author is expected to assign these rights for the benefit of the university. It is not intended that this policy affect the traditional university relationship to faculty members' owner-ship of books or other instructional materials whose preparation was not supported or assisted in a substantial way by the university.

Individuals preparing or planning to prepare educational materials are encouraged to clarify whether the materials are covered by this policy through consultation with the appropriate department chair and dean.

In cases in which a prospective author wishes to receive support from the university in a proposed development of educational materials covered by this document, the university will enter into an agreement with the prospective author prior to the development of the university-sponsored educational materials setting forth the extent of support, if any, associated with their development and providing for payment to the author and/or the distribution of earnings, if any should accrue from the use, rental royalties, or sale of the educational materials.

Monies in excess of costs and appropriate reserves that are received from use, rental royalties, or sale of the university-sponsored educational materials shall accrue to the benefit of the university, with the author receiving by prior agreement a specified portion of the net income. However, the author may receive a share of first receipts.

Operational responsibility for university-sponsored educational materials is vested in the appropriate deans or their designated representatives.

Plaintiffs argue that USOFT was "educational" in nature, and thus under Section 8.3.6.3 they retained the authorship to USOFT. There is no evidence in the record to demonstrate USOFT was educational in nature or otherwise used for academic instruction. The record demonstrates USOFT was developed not to as-

sist in educating ISU students, but instead to assist in the ultrasound imaging research. In the absence of more specific language in Section 8.3.6.3 of the Handbook, the unsupported assertion that USOFT was a Section 8.3.6.3 educational material is insufficient to generate a genuine issue of material fact.

Section 8.3.6.5 of the Faculty Handbook is entitled "Intellectual Property: Policies and Procedures." This section states as follows:

**8.3.6.5. Intellectual Property: Policies and Procedures.**

The Policy on University–Sponsored Education Materials, as approved by the Board of Regents (above), recognizes certain traditional exemptions to the university's ownership. *Ownership and licensing of other materials is often reserved to the university.* The Office of Intellectual Property and Technology Transfer (OIPTT) or the Iowa State University Research Foundation, Inc. (ISURF). OIPTT maintain current records on the following subjects as listed on their web page http://www.techtransfer.iastate.edu:

Policy Statement of ISU Concerning University Sponsored Educational Materials

Patent and Licensing Procedures

Patent Policy

Patent Royalty Distribution Policy

Plant Germplasm Release Policy

Trademark Management Policy

OIPTT provides educational services on issues related to intellectual property. ISURF owns and manages all Iowa State University intellectual property. When members of the university community apply for sponsored funding, they sign the following statement on the Gold Sheet: "I agree to be bound by the terms and conditions of the outside grant or contract which supports this proposed activity and, in consideration of the information and facilities made available to me by the university or the outside sponsor, to assign copyright and patent rights to the Iowa State University Research Foundation, Inc. in accordance with terms and conditions stated in the *Faculty Handbook.* I certify that I have not been debarred, suspended or declared ineligible to receive federal agency funds." In signing such a statement, the faculty member agrees that any intellectual property arising from sponsored funding will be assigned to ISURF. ISURF has the responsibility for managing all legal aspects of obtaining protection for intellectual property. The Office of Intellectual Property and Technology Transfer works closely with ISURF and with faculty and administrators within the university to obtain and evaluate disclosures, to determine the appropriate means of protection of intellectual property, and to aid in the marketing of that property. Individuals are reminded that the legal doctrine of fair use governs the use of copyrighted materials. If there is doubt whether material may be copied, inquiries should be directed to Office of University Counsel. ISURF also manages all aspects of protection and use of university trademarks.

Defs.' App. 121–123 (emphasis added). Rouse and Wilson argue that these two sections of the Faculty Handbook clearly indicate the existence of a written agreement, as defined by 17 U.S.C. § 201(b), limiting "work for hire" for Rouse and Wilson in accordance with the terms of the Faculty Handbook.

■ "An agreement altering the statutory presumption under the Copyright Act must be *express." Manning v. Bd. of Tr. of Cmty. Coll. Dist. No. 505 (Parkland Coll.),* 109 F.Supp.2d 976, 981 (C.D.Ill. 2000) (citing *Baltimore Orioles, Inc. v.*

*Major League Baseball Players Ass'n,* 805 F.2d 663, 672 (7th Cir.1986)). An employee policy is insufficient to alter the statutory presumption under the Copyright Act. *Id.* Further, ISU policy advises that "[F]ederal law will take precedence over any conflicts with a policy or state law." Defs.' App. 60. Rouse and Wilson have failed to produce a written agreement between themselves and ISU that expressly states on its face that Rouse, Wilson, or Amin would have claim to a copyright to USOFT, to the exclusion of ISU.[5] Their current arguments to that effect conflict with their prior behavior, as discussed elsewhere in this order.

In any event, ISU expressly acknowledges the work-for-hire doctrine applies to employees and faculty members. ISURF and OIPTT policies that pertain to copyright state that the ownership of copyright in traditional scholarly works, such as poems, plays, visual arts, textbooks, and musical compositions, remain with the student or faculty authors. Defs.' App. 60. This policy then goes on to state as follows:

> Other types of copyrighted works such as software, instructional materials, and works of non-faculty employees are owned by the university or for the benefit of the university when:
>
> * Significant university resources are required to develop a copyrighted work. The current policy requires that an agreement be entered into between the developers and the university prior to the development of work. Concerns about determining whether significant resources will be used or have been used should be taken to the Department head and/or Dean who may consult with OIPTT. Funded research is considered a use of significant university resources.
>
> * *Copyrighted works are produced by university employees in performance of the duties of their position at ISU. These works are considered developed under copyright's work-for-hire doctrine, under which the university is considered the author and owner of the copyright.*
>
> * The work may also be patented, such as the case with software. (Note that in these cases, the university reserves the right to pursue multiple forms of legal protection).
>
> * The work uses any of the university trademarks, including the names ISU, Iowa State, or Cyclones.

Defs.' App. 60 (emphasis added). Rouse and Wilson argue they never used grant money in creating USOFT; however, both testified they raised over $1.6-million in funding for the ultrasound imaging research, and the record shows a small portion of these funds were used to purchase the computers on which USOFT was developed. Further, both Rouse and Wilson testified they spent over fifteen years at ISU conducting this research, and such a significant amount of time cannot be said to be anything but in the performance of their duties in their position at ISU. The work not only uses the name Iowa State University, USOFT actually has the internationally known copyright symbol "©" in front of Iowa State University's name on the USOFT screen displays. While it is

---

5. Even if the Faculty Handbook constituted an express, written agreement as required by the statute, there is no record evidence that Rouse or Amin signed any letters of intent incorporating the Faculty Handbook into their employee contracts, as copies of such were not produced anywhere in the record.

On September 18, 2007, counsel for Rouse, Wilson, and Amin provided the Court with a letter of intent signed by Wilson; however, this letter of intent only covers a probationary appointment and indicates the probationary period will be completed on June 30, 1991.

unclear if USOFT is the type of software that actually can be patented, it appears that given the record of this case, the development of USOFT falls into practically every category ISURF and OIPTT have described as being works in which ownership in the copyright will vest in the University.

Plaintiffs also refer to the Certificate of Registration; however, the belated 2005 Certificate of Registration from the Copyright Office for USOFT does not entitle them to a finding that the certificate is prima facie evidence of the validity of the copyright and of the facts stated in the certificate.

In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 U.S.C. § 410. Plaintiffs assert they had not previously filed for ownership because there was no incentive to do so, but this argument runs contrary to their claims that they have always owned the copyright to USOFT and the fact they knew Defendants had been using USOFT since Walter & Associates opened their CUP lab in January of 2001. While Plaintiffs contend that it had been exhaustively stated that USOFT was intended only as research software and had not been intended for commercial use, they were fully aware that Walter & Associates was doing just that—operating the CUP lab—using USOFT, in the private sector. Plaintiffs state they failed to register the copyright in 2005 because they could not bring an action for copyright infringement until an application had been made to register the work in the Copyright Office. 17 U.S.C. § 411(a) ("[N]o action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title."). The 2005 Certificate of Registration indicates the creation of the work was completed in 1996. The section that requests the date of first publication was left blank. The belatedly filed Certificate, in its incomplete form, does not constitute prima facie evidence of the validity of the copyright. While ISU did not have a registered copyright at the time of the references in the published articles and on the software itself, such references clearly evidence the understanding of the parties before their interests changed.

Plaintiffs have failed to generate a genuine issue of material facts regarding whether an express, written agreement existed between ISU and the Plaintiffs that exempts USOFT from the "work for hire" doctrine.

## II. IS USOFT COPYRIGHTABLE?

Defendants argue USOFT is not copyrightable because it is a "method of operation" under 17 U.S.C. § 102(b) and that under the Copyright Act, copyright protection does not extend to methods of operation, which are distinguishable from expressions of ideas. Defendants assert that if all of the unoriginal elements are filtered out of USOFT, specifically LAIPS and VisionTools, then USOFT is largely an interface and as such is a mere method of operation and is therefore not copyrightable material. Plaintiffs contend USOFT contains detailed algorithms, which perform independent calculations on the data provided, and it is not a mere method of operation under 17 U.S.C. § 102(b).

"Computer programs are entitled to copyright protection." *Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.,* 220 F.3d 396, 400 (5th Cir.2000) (citing

*Eng'g Dynamics, Inc. v. Structural Software, Inc.,* 26 F.3d 1335, 1341 (5th Cir. 1994)). "A 'computer program' is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101. Copyright protection does not extend to "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). "Copyrighted software ordinarily contains both copyrighted and unprotected or functional elements." *Sony Computer Ent., Inc. v. Connectix Corp.,* 203 F.3d 596, 599 (9th Cir.2000).

Determining whether USOFT as a whole is copyrightable is not so easy a task. The most comprehensive test utilized by courts is known as the "Abstraction–Filtration–Comparison" test, which essentially dissects the software down to its varying levels, filters out the nonprotectable elements, and examines the remaining elements. *Kohus v. Mariol,* 328 F.3d 848, 855 (6th Cir.2003); *Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 9 F.3d 823, 834 (10th Cir.1993); *Computer Associates Intern., Inc. v. Altai, Inc.,* 982 F.2d 693, 702 (2nd Cir.1992). Typically this test is used when comparing software with an allegedly infringing program to determine if the remaining elements have misappropriated substantial elements of the copyrighted work, but the test would be similarly useful in the context of determining whether a particular program contains any elements that are subject to copyright protection.

■■■ In the present case, the Court need not concern itself with dissecting the USOFT program and making determinations regarding whether each different portion of the program is or is not entitled to copyright protection. Because the Court is confronted with a situation not where elements of a program have been copied but instead where the entire program itself has admittedly been used by the alleged infringer, the only question the Court needs to be concerned with is if *any* part of USOFT would have been entitled to copyright protection. As a computer program, USOFT possessed a unique source code, and the law is well settled that source codes are protected by the Copyright Act.[6] *Southco, Inc. v. Kanebridge Corp.,* 390 F.3d 276, 296 (3rd Cir. 2004) (source code protected by copyright); *Gen. Universal Sys., Inc.,* 379 F.3d at 142 (source code subject to copyright protection); *Computer Associates Intern., Inc.,* 982 F.2d at 702 (source and object codes subject of copyright protection); *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1249 (3rd Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984) (source and object code subject to protection); *Cognotec Services, Ltd. v. Morgan Guar. Trust Co. of New York,* 862 F.Supp. 45, 49 (S.D.N.Y.1994) (source and object code subject to protection). Defendants conceded at the motion hearing that a source code is subject to copyright protection. USOFT was a copyrightable software program because at the very least, the source code would be protected by the Copyright Act.

### III. CAN ROUSE AND WILSON ESTABLISH DAMAGES?

Defendants argue that even if Rouse and Wilson could establish ownership in USOFT, as a matter of law, their actions do not warrant an award of any damages

---

**6.** "Source code is a textual computer language that human programmers can read. This source code is translated by a program called a compiler into object code, the binary language that can be executed directly by a computer." *Gen. Universal Sys., Inc.,* 379 F.3d at 142 n. 20.

for copyright infringement. Because Defendants have, in the alternative, raised the issue of damages, the Court will address the availability of damages to Plaintiffs were they able to generate a genuine issue of material fact with regards to their copyright infringement claim.

### A. Delay in Bringing the Infringement Action.

■ As noted below, the Copyright Act contains a statute of limitations under 17 U.S.C. § 507(b). While the Eighth Circuit has not squarely addressed whether laches applies to a claim of copyright infringement, it has recognized that laches generally cannot bar a federal statutory claim where the statute under which that claim is brought contains an express limitations period within which the action is considered timely. "[S]eparation of power principles dictate that federal courts not apply laches to bar a federal statutory claim that is timely filed under an express federal statute of limitations." *Ashley v. Boyle's Famous Corned Beef Co.*, 66 F.3d 164, 170 (8th Cir.1995); *see also Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 797 (4th Cir.2001) (in copyright context, noting that "an equitable timeliness rule adopted by courts cannot bar claims that are brought within the legislatively prescribed statute of limitations."); *Zitz v. Pereira*, 119 F.Supp.2d 133, 142 (E.D.N.Y.1999) (finding laches defense in copyright action unnecessary, because the infringing conduct either fell outside of the limitations period, and was barred, or fell within the statute of limitations, and thus laches was not available to bar those claims). To permit a defense of laches given the inclusion of a statute of limitations in the Copyright Act runs contrary to the Congressional determination regarding the limitations period in a copyright action. The Court finds, in the absence of extraordinary circumstances not present here, laches will not bar an action

that is timely filed under the limitations period set forth in the Copyright Act.

### B. Under the Statute of Limitations, are Rouse and Wilson Barred From Recovering Damages for Any Alleged Infringement Occurring Prior to August 1, 2002?

■ "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). "A cause of action for copyright infringement accrues when one has knowledge of a violation or is chargeable with such knowledge." *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994) (citing *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 507 F.Supp. 1128, 1135 (D.Nev.1980)); *see also Hoste v. Radio Corp. of America*, 654 F.2d, 11, 11–12 (6th Cir.1981). Contrary to Plaintiffs' assertion in their resistance that they did not know USOFT was being used by Defendants until the filing of this action, Rouse testified he was aware Walter was using the USOFT program from the moment Walter & Associates started operating the CUP lab. Defs.' App. 167. Amin testified that after the fact, he was made aware that USOFT was included in what was transferred when the lab was transitioned to Walter & Associates. Rouse and Wilson did not bring suit until August 1, 2005. Thus, by operation of 17 U.S.C. § 507(b), even if Plaintiffs possessed a valid copyright infringement claim, Plaintiffs could not recover damages attributable to any acts of alleged infringement that occurred prior to August 1, 2002.

### IV. AS A MATTER OF LAW, ARE ROUSE AND WILSON ESTOPPED FROM OBTAINING RELIEF UNDER THE COPYRIGHT ACT?

■ "A plaintiff is estopped from asserting a copyright claim if he has aided

the defendant in infringing or otherwise induced it to infringe or has committed covert acts such as holding out ... by silence or inaction." *Field v. Google, Inc.*, 412 F.Supp.2d 1106, 1116 (D.Nev.2006) (quoting *Quinn v. City of Detroit*, 23 F.Supp.2d 741, 753 (E.D.Mich.1998)) (quotations omitted). To succeed on a defense of estoppel, Defendants must establish (1) Rouse and Wilson knew of Defendants' allegedly infringing conduct; (2) Rouse and Wilson intended that Defendants rely upon their conduct or acted so that Defendants had a right to believe it was so intended; (3) Defendants were ignorant of the true facts; and (4) Defendants detrimentally relied on Rouse and Wilson's conduct. *Id.* (citing *Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir.2003)).

■■■ The record shows Rouse and Wilson were aware Defendants were using USOFT. As previously addressed above, Rouse testified he was aware that Walter & Associates was using USOFT since Walter & Associates took over the CUP lab in January 2001. Rouse testified that he did not think they had ever told Marvin Walter that they had an ownership or copyrightable interest in USOFT. Defs.' App. 167. There is no question that Defendants leased computers from the Department of Animal Science and Walter testified that Amin helped install the software on the computers Defendants were using for the CUP lab. Defs.' App. 405. These computers contained a copy of USOFT.

Defendants contend that Rouse and Wilson acted in a manner so that Defendants had a right to believe Rouse and Wilson intended Defendants to use USOFT. In her sworn affidavit, Lovejoy states that Rouse and Wilson assured her they would provide a list of all of the equipment and software Marvin Walter would need to operate a CUP lab and that she was provided a list of the image processing and interpretation software sources, which included

USOFT, and a list of specifications for the centralized processing server and computer. This list included USOFT, and the list indicated Amin was the contact person for USOFT. Defs.' App. 134. Lovejoy further stated that on January 2, 2001, she provided Marvin Walter with a draft License Agreement for the LAIPS software and included a letter in which she wrote, "An offer for license can only be made when ISURF is reasonably assured that the publicly available materials identified by Doyle Wilson and Gene Rouse along with a license to the LAIPS software are sufficient to operate a centralized processing system." Defs.' App. 134, 140. Lovejoy indicated in her affidavit that on January 2, 2001, she contacted Amin to ask him about obtaining USOFT for Walter's use in the CUP lab, and Amin assured her USOFT was "free to anyone who wants it." Defs.' App. 135. Lovejoy included a notation of this remark in her notes. Defs.' App. 137. ISURF subsequently made an offer to license LAIPS to Walter & Associates, and Walter & Associates proceeded to use USOFT as part of its operations of the CUP lab. As discussed above, the USOFT menu pages clearly displayed "© Iowa State University." Plaintiffs have failed to show there is a genuine issue regarding whether they acted so that Defendants had a right to believe it was intended they rely on Rouse, Wilson, and Amin's conduct.

Plaintiffs contend that starting in 2003 they informed ISU administrators and persons at ISURF that they suspected Defendants were using USOFT illegally and without their permission, but Plaintiffs also admit that they did not inform ISURF prior to 2005 that they believed they owned the copyright to USOFT. Rouse, Wilson, and Amin's only complaint regarding USOFT prior to 2005 was that USOFT was for research purposes only. Defendants assert that with regard to the third element, they were ignorant of Rouse and

Wilson's hidden claim of ownership. Indeed, although Rouse testified that he and Wilson informed Walter that a new front-end program would need to be written, and that Defendants could not use USOFT, Rouse admits he never made an assertion of ownership in USOFT. Wilson testified that prior to January 27, 2005, they had never expressed in writing that they had a claim of ownership in USOFT, nor had they made an oral expression. Defs.' App. 258. Amin also testified that he never told ISURF that he, Rouse, and Wilson were the owners of USOFT. Defs.' App. 329. In a Material Transfer & Limited Use License Agreement, which Wilson signed on July 18, 1996, USOFT was described as the property of ISURF. Defs.' App. 186. Plaintiffs argue that Defendants were never unaware of the true facts, because they knew they were not supposed to use the USOFT program. The true fact at issue is whether Defendants knew Plaintiffs owned the copyright in USOFT. The record demonstrates they did not. There is no evidence to establish that prior to 2005 Defendants knew Plaintiffs were making a claim of ownership in USOFT. In fact the evidence establishes the contrary: USOFT was repeatedly represented to be the property of ISU.

Finally, Defendants contend that they detrimentally relied on Rouse and Wilson's representations, because Walter & Associates thought it was getting everything needed to run the CUP lab. Defendants contend they never would have started using USOFT if Amin, Rouse, and Wilson's alleged ownership interests had been made known from the start. Plaintiffs argue Defendants could not have possibly believed they were getting everything they needed to run a CUP lab, and thus they cannot establish detrimental reliance.

While the licensing agreement may have pertained solely to LAIPS, Lovejoy informed Walter a licensing agreement would not be forthcoming until she determined that the publicly available materials identified by Wilson and Rouse, along with a license to the LAIPS software, would be sufficient to operate a centralized processing system. A license agreement was sent to Defendants shortly thereafter. It was thus reasonable for Defendants to rely on Lovejoy's prior statement in inferring they had everything they needed to operate a CUP lab. Defendants detrimentally relied on Plaintiffs' conduct in operating the CUP in the private sector.

Defendants have established there is no genuine issue of material fact with regard to the four elements necessary to prove a defense of estoppel, and Rouse and Wilson, if they possessed a valid copyright infringement claim, would be estopped from asserting an infringement claim as a matter of law.

## V. AS A MATTER OF LAW, HAVE ROUSE, WILSON, AND AMIN ABANDONED THEIR ALLEGED OWNERSHIP RIGHT TO THE COPYRIGHT FOR USOFT?

Waiver is the "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). "In copyright, waiver or abandonment of copy right occurs only if there is an intent by the copyright proprietor to surrender rights in his work." *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1026 (9th Cir.2001) (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer On Copyright* ¶ 13.06 (2000)) (quotations omitted).

The record is filled with evidence that indicates Rouse, Wilson, and Amin have, until recently, abandoned any ownership rights they may have had in USOFT. The license agreement between ISU and Evergreen Technologies specifically stated that VisionTools could only be distributed

**1070**

on a noncommercial basis within ISU and its departments; thus, VisionTools could not be used to develop privately owned software. In writing USOFT and the screen displays, Amin admits he is the one that included "© Iowa State University" in the software screen displays. Wilson signed off on a Material Transfer Agreement that specifically referred to USOFT as property of ISURF. Plaintiffs contend this was just a boilerplate document used to transfer two programs to a joint research project between AGBU and ISU; however, the language on the face of the document speaks for itself. The record shows Rouse, Wilson, and Amin co-authored a published article in which they stated that USOFT was technology developed by Iowa State University and owned by ISURF. Finally, Rouse, Wilson, and Amin assisted in the transfer of the CUP lab to Defendants in 2001, and at no time did they make an assertion or claim of ownership in USOFT, yet they were fully aware the leased computers had copies of USOFT on them and that Defendants were using the USOFT program in the CUP lab. Lovejoy contends Amin was the one who told her USOFT was "free to anyone who wants it." Even if the record presented a genuine issue regarding Plaintiffs' ownership in the USOFT copyright, via their actions, Plaintiffs have intentionally abandoned any ownership interest they had in the copyright of USOFT.

## VI. CONCLUSION.

In their attempt to avoid summary judgment on their copyright infringement claim, Plaintiffs have submitted personal declarations that were written after their depositions were conducted and contain assertions that are contrary to their deposition testimony. Plaintiffs attempt to dis-

pute the documentary evidence that was contemporaneous to the creation of USOFT with mere allegations, unsupported by any evidence in the record. Plaintiffs urge the Court to ignore the plain language of the written documents that are in existence regarding the representations that were made pertaining to USOFT's ownership. "[A] properly supported motion for summary judgment is not defeated by self-serving affidavits." *Conolly v. Clark,* 457 F.3d 872, 876 (8th Cir.2006). "A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Davidson & Associates v. Jung,* 422 F.3d 630, 638 (8th Cir.2005). The record demonstrates that there are no genuine issues of material fact regarding whether USOFT was work for hire under the Copyright Act. The Court concludes USOFT was work made for hire, and therefore pursuant to 17 U.S.C. § 201(b), ISU is considered the author for purposes of the Copyright Act. Because ISU is deemed the owner of the copyright, Rouse and Wilson have no standing to bring a copyright infringement claim with respect to USOFT. Even if the Court were to conclude otherwise, Plaintiffs would be estopped from maintaining a copyright infringement claim and have otherwise abandoned any ownership interest they may have had in the copyright. Defendants' Motion for Summary Judgment therefore must be granted.

**PLAINTIFFS/COUNTER DEFENDANTS AND THIRD-PARTY DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT[7]**

In the Third Amended Answer, Defendants listed counterclaims of negligent

7. Rouse and Wilson assert that Defendants could only properly deploy a claim of negligent misrepresentation against ISURF. In-

deed, "the tort predominantly applies to situation where the information supplied harmed

misrepresentation against Rouse, Wilson, and Amin. With regard to Rouse and Wilson, Defendants alleged that Rouse and Wilson represented to ISURF that ISU owned and could license to Walter & Associates all of the software needed to operate a CUP laboratory. Alternatively, Defendants alleged that Rouse and Wilson represented to ISURF that USOFT was in the public domain, and thus ISURF could deliver it with other licensed software.

Defendants contend that Amin represented to Lovejoy that USOFT was free to anyone who wanted it, and that based on this representation, ISURF prepared and entered into a licensing agreement with Walter & Associates. Defendants contend Walter & Associates used USOFT and paid royalties to ISURF, and that Walter & Associates relied on the truth of the information supplied and was justified in relying on that information. Defendants argue Walter & Associates has invested significant funds and resources into developing ultrasound beef quality analysis into a commercially viable and successful product, and that the negligently supplied information was a proximate cause of damage to Walter & Associates.

 Rouse, Wilson, and Amin have moved for partial summary judgment, requesting the Court dismiss Defendants' claims of negligent misrepresentation against them. Rouse, Wilson, and Amin contend that they owed no duty of care toward Defendants, and that Rouse and Wilson never made any representations to Defendants. Rouse, Wilson, and Amin assert that any alleged misrepresentations made by them were made only to ISURF

personnel and not to Defendants, and that ISURF is a distinct organization from ISU and is independently incorporated under the Iowa nonprofit corporation statute.

The elements for the tort of negligent misrepresentation are: (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. (2) ... (T)he liability stated in Subsection (1) is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*Barske v. Rockwell Intern. Corp.,* 514 N.W.2d 917, 924 (Iowa 1994); *see also Beeck v. Kapalis,* 302 N.W.2d 90, 96–97 (Iowa 1981). "In Iowa liability for negligent misrepresentation arises only when the information is provided by persons in the business or profession of supplying information to others." *Boone County Cmty. Credit Union v. Masel,* 2003 WL 1050344, \*2 (Iowa App.2003).

---

the plaintiff in its relations with third parties, as opposed to harm to a plaintiff in its relations with the provider of the information." *Sain v. Cedar Rapids Cmty. Sch. Dist.,* 626 N.W.2d 115, 126 (Iowa 2001). In the present case, the information allegedly supplied harmed Walter & Associates in its relations with Rouse, Wilson, and Amin, the providers

of the information. Rouse and Wilson argue that ISURF's representations harmed Walter & Associates in its relations with Rouse, Wilson, and Amin, and thus a claim of negligent misrepresentation could only be properly brought against ISURF, who is no longer a party to this case.

## I. DID ROUSE AND WILSON HAVE A DUTY OF CARE TO DEFENDANTS?

■ Rouse and Wilson argue they owed no duty of care to Defendants, and thus as a matter of law Defendants' claim of negligent misrepresentation against them must fail. "Absent a special relationship giving rise to a duty of care, a [claimant] cannot establish negligent misrepresentation." *Jensen v. Sattler*, 696 N.W.2d 582, 588 (Iowa 2005).

> In Iowa liability for negligent misrepresentation arises only when the information is provided by persons in the business or profession of supplying information to others. *Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 492 (Iowa 2000). This is because a person in the profession of supplying information for the guidance of others is acting in an advisory capacity and is manifestly aware of how the information will be used, and intends to supply it for that purpose. *Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 124–25 (Iowa 2001).

*Boone County Cmty. Credit Union*, 2003 WL 1050344, *2 (Iowa App.2003). "Thus, when deciding whether the tort of negligent misrepresentation imposes a duty of care in a particular case, we distinguish between those transactions where a defendant is in the business or profession of supplying information to others from those transactions that are arm's length and adversarial." *Sain*, 626 N.W.2d at 124.[8] The requisite duty of care is found when the supplier is in the profession of supplying information in an advisory nature in a nonadversarial manner, the supplier of the information knows the recipient of the information intends to rely on the information, and the information is not provided incidental to some other transaction being provided. *See id.* at 126 (finding a high school guidance counselor is a person in the profession of supplying information to others); *Fry v. Mount*, 554 N.W.2d 263. 266 (Iowa 1996) (noting the duty has been applied to accountants and investment brokers); *Ryan v. Kanne*, 170 N.W.2d 395, 402–403 (Iowa 1969) (accountants owe duty of care). Whether a duty of care exists is an issue of law for resolution by the Court. *McLeodUSA Telecomm. Serv., Inc. v. Qwest Corp.*, 469 F.Supp.2d 677, 694 (N.D.Iowa 2007) (court to determine whether party was in the business of supplying information as a matter of law); *Fry*, 554 N.W.2d at 265 (whether a duty of care exists is always a question of law for the court to decide).

Rouse and Wilson assert it is undisputed that the only facts Defendants allege as to their actual negligent misrepresentation are that the professors allegedly represented to ISURF that "ISU owned and could license to Walter & Associates L.L.C. all the software needed to operate a centralized ultrasound processing laboratory ... Rouse and Wilson alternatively represented to ISURF that USOFT was in the public domain, and thus ISURF could deliver it with other licensed software." Rouse and Wilson further assert that fol-

---

**8.** Defendants, relying on *Sain*, contend that where a person has a pecuniary interest in providing the information, regardless of whether the pecuniary interest is direct or indirect, the person may be in the business or profession of supplying information to others. The *Sain* court explained in a footnote that the Restatement (Second) of Torts recognized two ways to establish a duty of care: "The information can be supplied by a person whose business it is to provide information, *or* the person otherwise has a pecuniary interest in the transaction in which the person supplies the information." *Sain*, 626 N.W.2d at 125 n. 3 (emphasis added). The court went on to state, "Notwithstanding, we have limited the tort to persons in the business or profession of supplying information to others."

lowing these alleged misrepresentations, ISURF and Walter & Associates subsequently entered into a commercial transaction at arm's length, with Walter & Associates obtaining a license for the LAIPS software program from ISURF, for which Walter & Associates paid ISURF royalties. Rouse and Wilson contend the information they gave ISURF was given gratuitously in response to inquiries made by ISURF, and that they were not compensated in any way by ISURF.

Defendants argue that both ISURF and Walter & Associates turned to Rouse and Wilson for information regarding the operation of the laboratory in the private sector, and that Rouse and Wilson agreed to serve as Walter & Associates' "technical advisors" to assist in the start-up of the private sector laboratory. Rouse testified that when it was established that Walter & Associates would have the commercial entity of their developed technology, Wilson and Rouse were told they would serve as technical advisors, and that he sat with the board of directors of Walter & Associates for two meetings. Wilson testified that he agreed to serve as a technical advisor during the transition of the CUP laboratory to Walter & Associates, and that he attended approximately two board of directors meetings. Wilson testified that Walter wrote him and Rouse a check for $100 after they attended one meeting, and they might have received a second check, but he was not sure.

A Separation of Responsibility and Conflict of Interest Statement indicates that Rouse and Wilson would advise and consult with the CUP commercial venture in regard to policy and technical matters. A summary of a planning meeting that is dated January 3, 2001, states that Rouse and Wilson were to complement a technical advisory board that was to be formed from the associations that would be the primary users of the service. In a letter

to Phil Bailey, dated January 8, 2001, Rouse and Wilson explained that they would continue to be involved in ultrasound research and training programs, and that they would continue to advise the CUP laboratory to ensure that the needs of the beef cattle industry are kept at the forefront relative to the CUP mission. Rouse and Wilson also stated in this letter that they were not financially vested nor administratively involved in the new commercial CUP venture.

Defendants contend that because Rouse and Wilson were not parties to the transaction between ISURF and Walter & Associates, Iowa cases recognizing that a party to an arm's length commercial transaction cannot state a claim for negligent misrepresentation against the other party to such transaction are inapposite. Defendants contend that the factual record supports a finding, based on the nature of the transaction, that Rouse and Wilson owed a duty of care to Walter & Associates.

The undisputed facts show that the alleged misrepresentations being attributed to Rouse and Wilson were made to ISURF. The statements were not made to Walter & Associates as part of Rouse and Wilson's functions as technical advisors to the CUP laboratory's operations. Thus their status as technical advisors cannot form the basis of a duty of care, as the alleged misrepresentations were not made in their capacities as technical advisors. Defendants correctly assert that Iowa has rejected a privity requirement for a claim of negligent misrepresentation. *Eldred v. McGladrey, Hendrickson & Pullen*, 468 N.W.2d 218, 220 (Iowa 1991) (citing *Ryan*, 170 N.W.2d at 402–403). The test is whether the third party to whom the supplier of the information owes a duty of care is actually foreseen and a member of a limited class of persons contemplated. *Ryan*, 170 N.W.2d at 402. Rouse and

Wilson cannot credibly argue that they did not know the information they provided to ISURF about the CUP laboratory operations was for the benefit and guidance of Walter & Associates. Wilson and Rouse were keenly aware that ISURF was working out the details of a deal to transfer the CUP lab to Walter & Associates for commercial use. Privity thus cannot act as a bar to the negligent misrepresentation claim given the circumstances presented in this case.

Defendants argue that Rouse and Wilson had an indirect financial interest in ensuring the establishment of a privately owned CUP laboratory because they would receive royalties from ISURF's licensing of LAIPS to a private laboratory. Defendants further contend that Rouse and Wilson believed they could sell interpretation software to Biotronics, Inc., their private business, and would generate profits based on the development and subsequent sale of Biotronics' software to Walter & Associates as the CUP business developed. Rouse and Wilson assert there is no evidence that they were compensated in any way for their alleged representations as to the USOFT program, and that it is undisputed that ISURF personnel were aware LAIPS is not the USOFT program and does not contain the USOFT program. Lovejoy testified that LAIPS was the only software referenced in the agreement between ISURF and Walter & Associates, and that ISURF No. 1480 does not include USOFT. Kirkland also testified that USOFT is not part of ISURF No. 1480, and that he never believed that it was. Rouse and Wilson contend that accordingly, any alleged representations they made as to USOFT are completely independent of the license money they received from Defendants' licensing of the LAIPS program from ISURF. Rouse and Wilson further argue that because USOFT was a research program and could not be used commercially, by definition they could not possess a pecuniary interest in the USOFT program, which is completely separate from the LAIPS program.[9] Rouse and Wilson contend their representations to ISURF were gratuitous and no duty of care existed.

Defendants assert that as part of their research project, Rouse, Wilson, and Amin were responsible for providing and reporting information, and that inherent in the research project was an expectation that Rouse and Wilson would report the results of their research identifying the manner in which a private CUP laboratory would be operated. Defendants argue that as academicians, Plaintiffs were expected to provide this information regarding their research, and that reporting this information was precisely what the AAA expected to get out of the research project it funded. Defendants assert Rouse and Wilson were in the business of providing information to others, citing *Greycas, Inc., v. Proud.* In that Seventh Circuit case, the appellate court discussed the propriety of a negligent misrepresentation claim against an attorney. *Greycas, Inc. v. Proud,* 826 F.2d 1560, 1564 (7th Cir.1987). The appellate court did not hold academicians were in the business or profession of supplying information to others for purposes of a claim of negligent misrepresentation, but instead simply added academicians to a list that included securities analysts and the news media in explaining these individuals produce socially valuable information, and discussing the idea that imposing heavy tort liabilities on producers such as these

---

9. The record is clear, however, that in order to run the LAIPS software, a front-end software, such as USOFT, was necessary, and that USOFT significantly enhanced the functionality of LAIPS.

may result in socially valuable information being under-produced. *Id.*

Rouse and Wilson aptly point out that to label them as in the business or profession of supplying information simply because they report the results of their research would effectively expose any job that requires any communication of work product to another to the tort, and thus nullify the explicit limitation of this tort to individuals in the business or profession of supplying information to others. There is no genuine issue of material fact regarding the specific nature and context of the representations. The Court concludes that Rouse and Wilson were not in the profession of supplying information. As research professors, their profession involved conducting research and developing new technologies based on the information gleaned from their research. Any information pertaining to ownership rights of their work product was incidental to their profession as researchers and faculty members at ISU, and extending a duty of care to them under the circumstances of this case would effectively expose any individual who communicates information about their work product to the tort of negligent misrepresentation. Historically the tort has only been applied to those professions that by their very nature deal with the dissemination of information in an advisory nature, such as attorneys or accountants. Rouse and Wilson, as professors of science, researching agricultural technology, simply cannot be deemed to be in the profession or business of providing information regarding the ownership rights of software, and any such information they provided can only be considered incidental to their work as professors conducting research. The Court concludes Rouse and Wilson were not in the business or profession of supplying information for the guidance of others, and there existed no special relationship between Rouse and

Wilson and Defendants that would give rise to a duty of care.

The Court finds that while Rouse and Wilson did not make a representation directly to Defendants, privity is not required for the tort of negligent misrepresentation under Iowa law. Rouse and Wilson were not in the profession or business of supplying information, and thus no duty of care existed. Plaintiffs'/Third–Party Defendant's Motion for Partial Summary Judgment on the claim of negligent misrepresentation as it pertains to Rouse and Wilson must therefore be granted.

## II. DID AMIN HAVE A DUTY OF CARE TO DEFENDANTS?

Amin contends the same arguments made in support of Rouse and Wilson's argument that they owed no duty of care to Defendants applies to him. The alleged misrepresentation made by Amin was made to ISURF employee Lovejoy. Lovejoy states that Amin told her the USOFT software was "free to anyone who wants it." Amin argues that he gave this information to Lovejoy at ISURF gratuitously and was not compensated in any way by ISURF. Amin further contends he never communicated with Defendants, did not know that the information he provided was to be transferred to Defendants, and that he was not in the business or profession of supplying information to others and therefore never owed a duty of care to Defendants. Defendants contend Amin was not a party to the LAIPS licensing agreement between ISURF and Walter & Associates, he received royalties based on Walter & Associates' use of LAIPS in the CUP laboratory, and he is an owner of Biotronics and developed software that was offered for sale to Walter & Associates as the CUP business developed.

The arguments with respect to Amin are the same as those made with respect to

Rouse and Wilson. For the reasons discussed above, the Court concludes that as a salaried employee tasked with assisting in the research of faculty members, Amin was not in the business or profession of supplying information for the guidance of others, and his statement to Lovejoy that USOFT was "free to anyone who wants" it was incidental to his responsibilities as a researcher. The Court therefore finds there is no genuine issue of material fact regarding any representations by Amin, and that there existed no special relationship between Amin and others that would give rise to a duty of care. Plaintiffs'/Third–Party Defendant's Motion for Partial Summary Judgment is therefore granted with respect to the claim of negligent misrepresentation against Amin.

## III. CONCLUSION.

The Court finds that because no duty of care existed between either Rouse, Wilson, or Amin and Defendants, Defendants cannot maintain a claim of negligent misrepresentation against any of these parties, and Plaintiffs'/Third–Party Defendant's Motion for Partial Summary Judgment must be granted in its entirety.

### CONCLUSION

The Court concludes Walter & Associates, L.L.C., and Marvin Walter have not infringed any copyright interest of Gene Rouse, Doyle Wilson, or Amin Viren in the USOFT program. Defendants/Counter Claimants/Third–Party Plaintiffs Walter & Associates, L.L.C., and Marvin Walter's Motion for Partial Summary Judgment (Clerk's No. 85) must be **granted.**

Defendants/Counter Claimants/Third–Party Plaintiffs' claims for negligent misrepresentation fail as a matter of law. Plaintiffs/Counter Defendants and Third–Party Defendant's Motion for Partial Summary Judgment (Clerk's No. 94) must be **granted.**

The Clerk of Court is directed to enter judgment in favor of Defendants/Counter Claimants/Third–Party Plaintiffs and against Plaintiffs/Counter Defendants and Third–Party Defendant on Plaintiffs/Counter Defendants and Third–Party Defendant's claim for copyright infringement.

The Clerk of Court is directed to enter judgment in favor of Plaintiffs/Counter Defendants and Third–Party Defendant and against Defendants/Counter Claimants/Third–Party Plaintiffs on Defendants/Counter Claimants/Third–Party Plaintiffs' claims of negligent misrepresentation.

The above titled action shall be **dismissed.**

**IT IS SO ORDERED.**